Davida JOHNSON, et al., Plaintiffs,

v.

Zell MILLER, et al., Defendants,

and

Lucious Abrams, Jr., et al., Intervenors–Defendants,

and

United States of America, Intervenor–Defendant.

Civil Action No. CV 196–40.

United States District Court,
S.D. Georgia,
Augusta Division.

May 24, 1996.

As Corrected June 18, 1996.

**1531**

A. Rowland Dye, Dye, Tucker, Everitt, Wheale & Long, Augusta, GA, A. Lee Parks, Kirwan, Goger, Chesin & Parks, Atlanta, GA, for Davida Johnson, Joanne Murray Dixon, Mary S. Hargrove, Thomas M. Watkins, E.L. Lee, Craige Brooks, Billie Sue Thomson, Richard West, George Bagley, Dr., Curt Hamlin, Jimmy Rhodes, Ben Swilley, David A. Prisant, Earl C. Wetherington, Jr., Donald Shirah, C. Olen Gunnin, Jack H. Leverett, John Richard Sammons, Walter Matthews, Grace E. Durrence, Logan Lewis, Catherine Haley, Daniel Morrell, Tommy H. Hinton, Terri Ninsananda, Benjamin G. Spivey, Donald G. Sasser, Jim Grimshaw, John Danner, Terrell J. Embry, Greg Austin, Susan E. Rivers.

A. Lee Parks, Kirwan, Goger, Chesin & Parks, Atlanta, GA, for Jane A. Waldner, John E. Chance, Peggy A. Wood, Render Hill, Terri Ninsananda, Ann Miller.

David Frank Walbert, Walbert & Mathis, Atlanta, GA, for Zell Miller, Pierre Howard, Lewis Massey.

David Frank Walbert, Walbert & Mathis, Atlanta, GA, Sewell R. Brumby, Office of Legislative Counsel, Atlanta, GA, for Thomas Murphy.

Edmund Alexander Booth, Jr., United States Attorney, Augusta, GA, Donna M. Murphy, Elizabeth Johnson, Daniel H. Claman, Susan Barbosa Fisch, Richard B. Jerome, Dept. of Justice, Civil Rights Div., Washington, DC, for United States of America.

Laughlin McDonald, American Civil Liberties Union, Inc., Atlanta, GA, for intervenors-defendants.

Before EDWARD E. CARNES, Circuit Judge, and BOWEN and JULIE E. CARNES, District Judges.

## MEMORANDUM OPINION ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PER CURIAM:

In this case ("*Johnson III*"),[1] Plaintiffs challenge the constitutionality of certain State House and Senate legislative districts within the State of Georgia and seek preliminary injunctive relief enjoining Georgia's upcoming elections under the challenged districting plan.[2] On April 30, 1996, this Court issued an Order granting a preliminary injunction and providing a Court-ordered interim redistricting plan. This Memorandum Opinion follows and explains that Order. A

1. Because of the complex procedural history of this case, we have adopted short-hand references to the different stages of litigation involving Georgia's legislative and congressional districting plans. Hereinafter, any reference to the three-judge district court opinion in *Johnson v. Miller*, 864 F.Supp. 1354 (S.D.Ga.1994), in which Georgia's Eleventh Congressional District was determined to be unconstitutional, or to the record of that proceeding, will be designated as *Johnson I*. The Supreme Court's affirmance of *Johnson I* will be referred to as *Miller v. Johnson*. Any reference to the actions taken by the same three-judge district court upon remand from *Miller v. Johnson*, including the determination that Georgia's Second Congressional District was un-

constitutional, or to the three-judge district court opinion in *Johnson v. Miller*, 922 F.Supp. 1556 (S.D.Ga.1995), *probable jurisdiction noted sub nom. Abrams v. Johnson*, —— U.S. ——, 116 S.Ct. 1823, 134 L.Ed.2d 928 (1996), in which a court-ordered congressional plan was implemented, will be designated as *Johnson II*. The present litigation, *Johnson v. Miller*, No. CV 196–40 (S.D.Ga. filed March 5, 1996), and the record adduced therein, will be designated *Johnson III*.

2. The Georgia General Assembly is a bicameral body comprised of a House of Representatives, containing 180 seats, and a Senate, containing 56 seats. Ga. Const. art. III, § 2, ¶ 1. Under the

final Order and Judgment of the Court will be issued after a full trial upon the merits of all of the issues ultimately joined in this proceeding. We stress the interim nature of the findings and relief afforded herein. The April 30 Order and this Memorandum Opinion are entered under the most exigent time constraints, but after due and thorough consideration of the issues we address.

## I. INTRODUCTION

In 1993, the Supreme Court recognized that a citizen may challenge redistricting legislation under the Equal Protection Clause by alleging that the challenged legislation, "though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno*, 509 U.S. 630, 649, 113 S.Ct. 2816, 2828, 125 L.Ed.2d 511 (1993). The way was thus cleared for constitutional claims against congressional voting districts that allegedly had been created for the prohibited purpose of segregating voters according to their race.

Such challenges were filed first in North Carolina, Louisiana, Texas, Florida, and Georgia. Indeed, southern states have proved to be fertile ground for *Shaw* claims, as many of these states are subject to the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 *et seq.*,[3] and, in particular, to section 5 of that Act, which requires preclearance of any redistricting plan.[4] The Department of Justice (the "DOJ") is the primary entity used to preclear such plans.[5] In the redistricting that followed the 1990 census, the DOJ indicated that those states under its section 5 power should maximize their number of majority black voting districts,[6] which directive potentially—and in Georgia, effectively—required the segregation of some black voters into their own districts. Because the DOJ's directive was potentially at odds with *Shaw* 's subsequent holding, redistricting plans enacted pursuant to the DOJ's directives have become vulnerable to constitutional challenges.

Georgia Constitution, the General Assembly is vested with the responsibility of redistricting or reapportioning both of its chambers. Ga. Const. art. III, § 2, ¶ 2. The districting plans now in place for the State Senate and House of Representatives are embodied in O.C.G.A. §§ 28–2–1 and 28–2–2. For ease of reference, these challenged plans will together be referred to as the "1992 plan."

3. Several southern states are subject to the Voting Rights Act. *See* 28 C.F.R. § 51 (at Appendix) (listing, among other areas, Alabama, Georgia, Louisiana, Mississippi, South Carolina, Texas, Virginia, and sections of North Carolina and Florida).

4. Under the Voting Rights Act, certain states or political subdivisions are prohibited from enforcing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" unless they: (1) have obtained a declaratory judgment from the District Court for the District of Columbia that the change is not "for the purpose or with the effect of denying or abridging the right to vote on account of race or color," or (2) have submitted the proposed change to the Attorney General and the Attorney General has precleared it. 42 U.S.C. §§ 1973b–1973c. This procedure applies to redistricting plans, 28 C.F.R. § 51.13 (1993), and it is intended to police those regions of the United States that had maintained voting "tests or devices"

serving to disenfranchise minority voters, 42 U.S.C. § 1973b.

5. Although the Act permits a covered state to obtain preclearance, via a declaratory judgment, from the United States District Court for the District of Columbia, testimony in this case indicated that, given the long period of time it typically takes for such litigation, that alternative is rarely practical in the typical redistricting situation in which elections must be held within months of the enactment of the redistricting plan.

6. The National Conference of State Legislators held a meeting in late June of 1990. A primary focus of the conference was reapportionment and compliance with the Voting Rights Act, with seminars tailored to address preclearance issues for states such as Georgia that had to obtain preclearance of any plan. *Johnson I,* Tr. I, at 15. These seminars and the speech of Assistant Attorney General John Dunne at the meeting indicated that if a majority black district could be drawn, it must be drawn, in order to obtain section 5 preclearance. As is discussed at length in this opinion, the DOJ vigorously enforced this directive in its review of Georgia's redistricting plans. The extent to which the DOJ may have insisted on black maximization in subordination of traditional districting principles in other covered states is a matter not explored in this opinion.

## II. AN OVERVIEW OF THE CASE WITH AN HISTORICAL BACKGROUND

While the facts of this case could be stated in isolation, a better understanding of the case obtains by first considering it in the context of other, related litigation. Much of the factual history of this case during the years 1991 and 1992 is directly related to, and established by, the evidence in *Johnson I*. In *Johnson I*, the three-judge district court determined the 1992 configuration of Georgia's Eleventh Congressional District to be unconstitutional under *Shaw v. Reno*. The State Defendants and certain Intervenor–Defendants[7] appealed directly to the Supreme Court, which affirmed in *Miller v. Johnson*, — U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

When the case was remanded to the three-judge court, the Plaintiffs, on the strength of the Supreme Court's opinion in *Miller v. Johnson*, challenged the constitutionality of the Second Congressional District of Georgia. The three-judge court, with no opposition by the Intervenor–Defendant DOJ, determined the Second Congressional District to be unconstitutional. After both the Eleventh and Second Congressional Districts of Georgia had been determined to be unconstitutional, the legislative leadership requested that the *Johnson I* Court defer consideration of any remedy in order to allow the State the opportunity to reapportion itself. The Georgia General Assembly then conducted a 1995 special session, in which it was rightfully concerned with not only the reapportionment of the unconstitutional congressional plan, but also with the constitutionality of its existing state plan of reapportionment (the 1992 plan) because of the Supreme Court's opinion in *Miller v. Johnson*, — U.S. ——, 115 S.Ct. 2475.[8]

The General Assembly succeeded in redistricting itself, but it was unable to agree upon congressional redistricting. Thereafter, the *Johnson I* Court ordered a remedy in the form of a revised congressional districting plan in *Johnson II*. The decision in *Johnson II* was appealed pursuant to 28 U.S.C. § 1253, and probable jurisdiction has been noted, 64 USLW 2625 (May 20, 1996).[9] The State submitted its legislative redistricting plan (the "1995 plan") to the Voting Rights Division of the DOJ for preclearance pursuant to section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

During the pendency of the DOJ's consideration of the 1995 plan, the same Plaintiffs in the present case (*Johnson III*) moved the *Johnson I* and *II* Court to allow an amendment which would enable the latter three-judge district court to address their constitutional challenges to State House and Senate districts. The *Johnson I* and *II* Court deferred ruling on the motion to amend that case.[10]

On March 5, 1996, Plaintiffs filed the present action (*Johnson III*) in the Southern District of Georgia, challenging the constitutionality of thirty-three separate State House and Senate legislative districts. The allegations in this case are virtually identical to those which had been stated in the motion to amend the complaint in *Johnson I* and *II*. Thus, the motion to amend the complaint in *Johnson I* and *II* was subsequently denied as moot. The initiating judge in *Johnson III* then sought the designation of a three-judge

---

**7.** *See infra* note 11 and accompanying text.

**8.** Many of the majority black House and Senate districts in the 1992 plan were used as "building blocks" to create the majority black Second and Eleventh Congressional Districts that have been declared unconstitutional. *Johnson I*, Tr. I, at 65; *Johnson III*, Tr. at 50–51.

**9.** The Intervenor–Defendants appealed the *Johnson II* Order. The State Defendants did not.

**10.** Plaintiffs' motion to amend was made after the notice of appeal was filed from the court's remedial Order of December 13, 1995, in *Johnson II*. The court recognized a substantial question concerning its jurisdiction to entertain Plaintiffs' motion in *Johnson I* and *II* while its final judgment in the remedy phase was on appeal to the United States Supreme Court. In any event, the motion to amend in *Johnson I* and *II* was mooted by Plaintiffs' subsequent filing of the present action.

district court by the Chief Judge of the Eleventh Circuit Court of Appeals.

At the outset, it is noted that this three-judge district court has jurisdiction in this proceeding pursuant to the provisions of 42 U.S.C. § 1973c and 28 U.S.C. § 2284. This Court was lawfully designated and convened by Order of the Honorable Gerald Bard Tjoflat, Chief Judge, United States Court of Appeals for the Eleventh Circuit, dated March 22, 1996. Moreover, the parties do not now contest the jurisdiction of this Court, the method of its composition, or that venue lies within the Southern District of Georgia.

## III. THE OPERATIVE FACTS

The facts of this case are inextricably related to the facts found by the three-judge court in *Johnson I* and affirmed by the United States Supreme Court in *Miller v. Johnson*. The Georgia General Assembly's consideration of reapportionment for congressional seats, the subject matter of *Johnson I* and *II*, and its consideration of reapportionment for state legislative seats, which is the subject matter of this action, were conducted contemporaneously. *Johnson I*, Tr. I, at 53. Thus, much of the story of Georgia's redistricting efforts in 1991 and 1992 has already been told in *Johnson I*. While this case is cast in separate pleadings and styled under a different case number, there is no material difference between what went on legislatively with respect to state and congressional redistricting in 1991 and 1992.

Further, each of the parties in *Johnson I* and *II* are parties in this case and the parties are represented by the same attorneys. Moreover, both of the Intervenor–Defendants in *Johnson I* and *II*, the DOJ and the Abrams Intervenors, have been allowed to

intervene as Defendants in this case under the same conditions imposed in *Johnson I*.[11]

Accordingly, to the extent that it is applicable herein, the entirety of the record of the proceedings in *Johnson I* has been adopted as part of the record in this proceeding. The attorneys for the parties have designated certain portions of the *Johnson I* record which they particularly wanted us to consider. We have done so, and we have considered other parts of that record where relevant.

In addition, all trial transcripts, admissions, agreements, and stipulations between the parties in the Second Congressional District and remedy phase of *Johnson II* have been admitted as part of the record in this civil action.

### A. *The 1991–92 Legislative Districting Process*

If the making of laws is as unsightly as the manufacture of sausage, the Georgia legislature's redistricting efforts in 1992 would be the headcheese of the business. Indeed, the recipe for the 1992 plan was neither a simple nor constitutionally savory concoction.

The population and voter information from the 1990 Decennial Census was delivered to the State of Georgia for its reapportionment purposes shortly before the deadline of April 1, 1991. *Johnson III*, Tr. at 36–37. The census, which revealed various changes in Georgia's population distribution and composition, authorized an additional congressional district and necessitated reformatting of the State House and Senate districts.

Even prior to receipt of the 1990 census data, the General Assembly prepared for reapportionment.[12] On February 28,

---

11. In *Johnson I* and *II*, the Abrams Intervenors consisted of six registered voters. In this suit, the Abrams Intervenors consist of three of the original six persons, together with over forty other registered voters, all of whom reside in various House and Senate districts challenged by Plaintiffs. The present Abrams Intervenors are represented by the same attorneys for the Ameri-

can Civil Liberties Union as in *Johnson I* and *II* and, for every practical purpose, the role of these Intervenors has been the same in this case as it was in *Johnson I* and *II*.

12. Technically, "reapportionment" refers to the allocation of representatives among previously established voting areas, while "redistricting" re-

1991, both the House and Senate adopted redistricting guidelines in order to clarify the drafting process.[13] *See Johnson III*, State Exh. 3, 4. Both versions required public hearings, allowed for submissions by "third parties" outside the Assembly, and provided a list of criteria: single-member districts only, equality of population among districts, contiguous geography, avoiding dilution of minority voting strength, following precinct lines where possible, and complying with sections 2 and 5 of the Voting Rights Act, 42 U.S.C. §§ 1973 and 1973c, respectively. Once these requirements were met, drafters could consider maintaining the integrity of political subdivisions, preserving the core of existing districts, and avoiding contests between incumbents.[14] Pursuant to the guidelines, public hearings were held throughout the state in the spring of 1991.

While the General Assembly presumably considered the guidelines a realistic tool for drafting reasonable voting districts and while some of its members were veterans of past redistricting wars, many of the legislators probably could not have anticipated the extraordinary and unprecedented steps that the DOJ would demand before preclearing the State's redistricting plan. Those requirements started to become apparent as early as late June of 1990 at the National Conference of State Legislators, which was attended by Representative Bob Hanner, Chair of the House Reapportionment Committee, several other legislative leaders, and Ms. Linda Meggers, Director of Reappor-

tionment Services for the Georgia General Assembly and a member of the state reapportionment task force.[15] A primary focus of the conference was reapportionment and compliance with the Voting Rights Act. Seminars were tailored to address preclearance issues for states such as Georgia, that are subject to preclearance. *Johnson I*, Tr. I, at 15. The most prominent speaker concerning the Voting Rights Act was Assistant Attorney General John Dunne. Mr. Dunne critically singled out the State of Georgia and its redistricting history, so much so that the Georgia delegation inferred that the DOJ would particularly scrutinize their efforts. Based on the seminars and Mr. Dunne's comments, Ms. Meggers and the legislative leadership came away from the conference firmly believing that in order to obtain section 5 preclearance, a state must draw a majority black district where one can be drawn. *Johnson III*, Tr. at 41–42, 301, 403. In other words, they perceived that the DOJ would require them to subordinate traditional race-neutral districting principles to the goal of maximizing the number of majority black districts.

During that same time, Ms. Kathleen Wilde, then an attorney with the American Civil Liberties Union, elicited the assistance of Ms. Meggers and the Reapportionment Office in creating a redistricting proposal for her clients, principally Representatives Cynthia McKinney and Tyrone Brooks.[16] *Id.* at 44, 46. The Reapportionment Office houses the computerized census data for the State.

fers to the reformulation of boundaries for those voting areas. We use the words interchangeably, however, because the legislature, case law, and the parties' attorneys do so.

**13.** These same guidelines were utilized for the drafting process of the State's congressional districts. *See Johnson I*, State Exh. 9, 10.

**14.** The guidelines' listing of the protection of incumbents as only a secondary consideration is somewhat misleading, however. Through the testimony in *Johnson III*, it has become apparent that incumbency considerations figure greatly in the drawing of a district, whether the district is majority white or black, and likewise whether the incumbent is white or black. As Representative Bob Hanner noted, enactment of any legisla-

tive plan requires the assent of a majority of the legislature, which necessitates a sensitivity to the concerns of incumbents.

**15.** Ms. Meggers is probably the single most knowledgeable person available on the subject of Georgian redistricting.

**16.** Ms. Wilde testified in *Johnson I* that she initially represented the Black Caucus. However, at some point, the Black Caucus could not agree on Ms. Wilde as its representative, and she began to represent only certain specific black legislators, including Representatives Brooks and McKinney. *Johnson I*, Tr. IV, at 93–94.

Its computer maintains data concerning the total population, the total black population, and the total voting age population, by race, down to the precinct and even census block levels of each county.[17] *Id.* at 34–35.

Ms. Meggers testified that Ms. Wilde came to the Reapportionment Office with a hand-colored map on which she had identified and shaded in majority black census blocks. *Id.* at 47. In order to create a majority black House district, Ms. Wilde, with the help of the Reapportionment Office staff, linked together enough majority black precincts and census blocks to create such a district. After she had created as many majority black House districts as she could muster, Ms. Wilde essentially linked the House districts together insofar as possible in order to create a plan for the Senate.[18] Ms. Wilde's House and Senate plans then became the basis for part of the lines forming the congressional districts later determined to be unconstitutional. *Id.* at 50–51; *Johnson I,* Tr. IV, at 72–73; *Johnson III,* Pl.Exh. 120–5, at 6–7 (sworn statement of Ms. Penny Williams of the Reapportionment Office).[19]

Because Ms. Wilde's goal was to create as many majority black districts as possible, her proposal earned the descriptive appellation, the "max-black plan." *Johnson I,* 864 F.Supp. at 1360. Although this plan served well its drafters' goal—to identify as many areas as possible where majority black districts could be created—it was not a cohesive state-wide plan, because it did not address districting in areas outside those regions where majority black districts were sought to be drawn. *Johnson III,* Tr. at 59. Indeed, as was later learned, it would have been impossible to adopt in its entirety the max-black plan and at the same time create a cohesive, workable plan for the entire state.[20]

The final max-black plan provided for: fifteen majority black districts in the State Senate, and forty-nine majority black districts in the State House. *Johnson III,* Pl. Exh. 2, 67, 174, 175. Comparing this plan to the 1982 legislative districting plan, modified to incorporate the 1990 census data, the number of majority black districts in existence under the 1982 plan was eleven in the Senate and thirty-two in the House. *Id.,* Pl.Exh. 124, 130. With regard to the number of majority black districts drawn in the max-black plan, Ms. Wilde asserted that her purpose "was to draw as many districts as possible consistent with equal opportunity for black citizens in Georgia." *Johnson I,* Tr. IV, at 71. That is, her plan attempted to increase the number of majority black districts so that their percentage of the total would equal the percentage of Georgia's black population. *Id.* at 72. It is clear, however, that the max-black plan also sought to maximize black voting strength by artificially pushing the percentage of black voters within some majority black districts as high as possible. *Johnson I,* 864 F.Supp. at 1361.

In order to achieve the max-black goals, the district lines had to be drawn in "funny ways,"[21] with little regard for geographical compactness, political subdivisions, or other traditional districting principles. The max-black plan was submitted to the legislature and the DOJ several times during the redistricting process. *Id.*

## B. *The Preclearance Process*

In August 1991, the General Assembly conducted a special session to consider its own redistricting and that of the State's congressional districts. The tortured progress

---

17. A census block is the smallest unit of population available to the demographer.

18. The ideal population required for one Senate district (115,682) is somewhat larger than the ideal population required for three House districts (35,990 × 3).

19. Ms. Meggers testified that usually the Senate and House districting plans are created independently of one another. *Johnson III,* Tr. at 50.

20. As explained *infra* at note 26, the task of crafting an entire state plan around every potential max-black district was an impossible one.

21. *See Johnson I,* Pl.Exh. 132, at 43 ("It's not really the appearance of the district; it's the content of the district." (Rep. Tyrone Brooks' Comments to the House)).

of the State's legislative redistricting plan mirrored that of Georgia's congressional redistricting plan. The legislative redistricting plan and the congressional redistricting plan were presented to the DOJ for preclearance at or about the same time. The legislative plans and congressional plans enacted by the General Assembly were rejected again and again by the DOJ in objection letters that echoed the same complaints: in essence, that the State had not created enough majority black districts, and that its failure to do so reflected its unwillingness to recognize the existence of "alternative configurations" that would "provide black voters ... with an opportunity to participate in the political process and to elect candidates of their choice." [22] As the *Johnson I* Court found, at the insistence of the DOJ, maximization of black voting strength became the order of the day. 864 F.Supp. at 1368–69. Indeed, because the first legislative plan was objected to by the DOJ, even though it increased the number of majority black legislative districts over those in existence in the 1982 plan,[23] it quickly became clear to legislators that retrogression was not the focus of the DOJ inquiry. Rather, the "alternative configuration" or "alternative plan" that the DOJ repeatedly criticized the State for not adopting was understood by the legislative leaders of the redistricting process to be the max-black plan. *See infra* at pp. 1538–1539.

The chronology of the legislative and congressional preclearance processes establishes an important linkage between this case and the *Johnson I* Court's finding that the DOJ's black maximization policy dominated the congressional redistricting process. The DOJ's contemporaneous review and simultaneous rejection of Georgia's legislative and congres-

sional redistricting submissions bolsters the application of such finding to this case. More specifically, on October 1, 1991, the State submitted the first legislative [24] and congressional districting plans passed by the General Assembly. The legislative and congressional districting plans were rejected by the DOJ in a January 21, 1992 letter. In that letter, the DOJ interposed objections to both plans, explaining that it was aware of other "reasonable alternative configurations" available to the legislature to enhance black voting strength. After making the perceived necessary changes in the plans, the State resubmitted the Senate and House plans on February 20, 1992, and the congressional plan on March 3, 1992. Again, both the legislative and congressional districting plans were rejected in a March 20, 1992 letter. The State submitted the House and Senate plans a third time for preclearance on March 25, 1992. The DOJ precleared the Senate plan but objected to H–133, demanding further increases in the black population of that district. After the General Assembly complied, the House plan was finally precleared on April 2, 1992, in the same letter that precleared the State's congressional plan.

The preclearance processes for the State congressional plan and the State legislative plan were closely related; the hearings, debates, negotiations, and the pressures the DOJ brought to bear upon the creation of both plans were inextricably intertwined. Thus, the evidence regarding the DOJ's preclearance methods and policies from *Johnson I* and *II* is relevant to this case. Because of that evidence and evidence we heard in this case, we reach the same finding of fact with regard to the legislative districting process that the court reached in *Johnson I*, 864 F.Supp. at 1364: the max-black plan became

---

22. *Johnson III*, Pl.Exh. 139, at 3.

23. In the first plan submitted to the DOJ, the State created twelve majority black Senate districts and thirty-eight majority black House districts. *Johnson III*, Pl.Exh. 149. The 1982 plan, as supplemented by the 1990 census data, contained only eleven majority black Senate districts and thirty-two majority black House districts. *Johnson III*, Pl.Exh. 124, 130.

24. As might be expected, the Georgia Senate did not meddle in the reapportionment of the Georgia House, and vice versa. Instead, each one passed without change what the other one had proposed for itself. *Johnson III*, Tr. at 50. Thus, each element of the bicameral legislature essentially redistricted itself.

the "benchmark" against which the DOJ measured Georgia's efforts.

During the redistricting process, Ms. Wilde maintained a close and informal relationship with the DOJ attorneys overseeing preclearance. *Id.* at 1362. The dynamics of that relationship were "that of peers working together, not of an advocate submitting proposals to higher authorities." *Id.* In fact, after the second objection letter of March 20, 1992, a DOJ attorney instructed Mark Cohen, the Senior Assistant Attorney General for Georgia, to work with Ms. Wilde on the House redistricting plan because Ms. Wilde "was still having some problems with it." *Johnson I,* Tr. V, at 3.

Another incident also demonstrates the extent to which the DOJ delegated the section 5 submission process to Ms. Wilde and dedicated that process to implementation of her max-black plan. On one occasion, Ms. Wilde and Representative McKinney were in one room of the Reapportionment Office on the telephone with a DOJ attorney to whom they were communicating how a particular district should be drawn; this DOJ attorney, in turn, would then parrot these directives of Ms. Wilde and Representative McKinney to Georgia Assistant Attorney General Cohen, who was on another telephone line in another room of the Reapportionment Office talking with the DOJ attorney. In essence, Ms. Wilde and Representative McKinney were simply dictating to Mr. Cohen, through a DOJ attorney, how a particular district should be drawn. *Johnson III,* Pl.Exh. 120–5, at 23 (sworn statement of Penny Williams of the Reapportionment Office).[25]

The most compelling evidence that the max-black plan was the benchmark for the legislative and congressional districting plans is the testimony of those persons directly involved with the process. Ms. Meggers testified that the max-black plan was the benchmark for the final plan in both the House and Senate. *Johnson III,* Tr. at 55. In several instances, Ms. Meggers testified that certain districts were drawn specifically to match the majority black districts in the max-black plan. *Id.* at 69, 82, 84, 93, 111, 113, 126, 133, 160, 167, 170. Throughout their testimony, Ms. Meggers and Representative Hanner explained that the legislative leadership interpreted the DOJ objections to be based specifically on the max-black plan. *E.g., id.* at 81 ("Basically we interpreted [the DOJ objections] to mean to come closer to drawing a plan that matched the Black Max House plan."); *id.* at 305 ("[W]e had to put the Black Max Plan into effect.").

Realizing that the "alternative configurations" and "alternative plans" referred to in the DOJ's objection letters were the max-black plan, and that acquiescence with the DOJ's demands was the only way to get a plan precleared, the House leadership became concerned only with drawing a legislative plan that "followed the letter to the letter." *Johnson III,* Tr. at 316. Senator George Hooks testified that the Senate adopted the same attitude. *Id.* at 364. The testimony of these persons directly involved with the reapportionment process is corroborated by comparing the max-black plan with the DOJ's demands in the objection letters. *See Johnson I,* 864 F.Supp. at 1362; *Johnson III,* Tr. at 149 ("As you read the [objection] letters it's obvious [the DOJ was] referring to the Black Max Plan as the[ ] benchmark in judging the submission.").

During litigation of *Johnson I,* the DOJ denied that the max-black plan was used as a benchmark, an implausible denial given the abundant and compelling evidence that that plan was obviously the benchmark for the

---

**25.** Another noteworthy incident occurred when State Senator Eugene Walker, a black man, and other Georgian leaders met with DOJ attorneys in Washington, D.C., to discuss the first submission of districting plans. One DOJ attorney, who had been told that Senator Walker was a "quintessential Uncle Tom," *Johnson I,* 864 F.Supp. at 1367; *Johnson I,* Tr. IV, at 27, impugned the motives of Senator Walker because he supported the State's congressional plan. 864 F.Supp. at 1367; *Johnson I,* Tr. II, at 44, Tr. IV, at 27. Senator Walker understandably took offense at this treatment, so much so that he refused to attend further meetings with the DOJ staff. 864 F.Supp. at 1367; *Johnson I,* Tr. II, at 47.

DOJ during the preclearance process. The *Johnson I* Court rejected the DOJ's denial, 864 F.Supp. at 1368, as did the Supreme Court, *Miller v. Johnson*, — U.S. at —, 115 S.Ct. at 2492 (stating "it would appear the Government was driven by its policy of maximizing majority-black districts," and referring to "the District Court's well-documented factual finding ... that the Department did adopt a maximization policy and followed it"). In defiance of the findings of those courts, and in the face of the overwhelming evidence against it, the DOJ stubbornly insists to this day that it did not pursue a black maximization policy in reviewing the State of Georgia's redistricting plans in 1992.[26] Apparently, even the suggestion that the DOJ pursued such a policy evokes disdain from high DOJ officials.[27]

Like the *Johnson I* Court, we find the DOJ's disclaimers to be disingenuous. It is clear that a black maximization policy had become an integral part of the section 5 preclearance process of the Voting Rights

Division of the DOJ when the Georgia redistricting plans were under review. The net effect of the DOJ's preclearance objection letters, issued pursuant to the black maximization policy, was to require the State of Georgia to increase the number of majority black districts in its redistricting plans, which were already ameliorative plans, beyond any reasonable concept of non-retrogression within the meaning of section 5 as interpreted by then existing case law, *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1358, 47 L.Ed.2d 629 (1976), and as subsequently interpreted in *Miller v. Johnson*, — U.S. at — – —, 115 S.Ct. at 2492–93.

By the end, the State of Georgia had submitted four different versions of the House plan and three different versions of the Senate plan. As compared to the number of majority black districts in the 1982 plan as adjusted by the 1990 census, the number of majority black Senate seats was increased from eleven to thirteen in the precleared version. The number of majority black

---

26. At various times in the liability hearing, the Defendant–Intervenors have argued that if the DOJ had really had a black maximization policy, it would have insisted on the incorporation of additional majority black districts in the max-black plan that were not included in the final version. *E.g., Johnson III*, Tr. at 178, 570. Ms. Meggers explained, however, that it was impossible to incorporate all of the majority black districts, drawn in isolation in the max-black plan, into a cohesive, workable plan for the entire state. *Id.* 59–60, 150 ("There was no way to fit them in. They were just beyond imagination."). On the whole, however, the final versions of both the House and Senate plans reflect versions of almost all the max-black districts. *Id.* at 60, 150.

Moreover, even if the DOJ could have forced the State to eke out additional majority black districts, that showing would not neutralize the constitutional implications for those districts created predominantly for racial reasons and in derogation of traditional districting principles. Stated somewhat differently, that the DOJ did not follow its black maximization policy with complete determination to reach perfectly maximum results does not render the policy unobjectionable under the Equal Protection Clause as interpreted in *Miller v. Johnson*. An agency or official who violates the Constitution is no less guilty of doing so merely because more mischief could have been done than was.

27. During the oral argument before the United States Supreme Court in *Miller v. Johnson*, — U.S. —, 115 S.Ct. 2475, the following colloquy took place between the Court and Solicitor General Drew S. Days, III:

QUESTION: Well, the findings of the court below indicated that the Department of Justice was insisting upon maximization of any possible black voting strength. It was not retrogressive for the State to create two districts, but the Department of Justice insisted on three majority minority, and the court found that to be the case, and was it the policy of the Department of Justice to insist upon maximization—
GENERAL DAYS: Absolutely—
QUESTION: —of all possible—
GENERAL DAYS: Absolutely not.
QUESTION: —strength? I mean, it certainly appeared to be the case, and—
GENERAL DAYS: Well, I—
QUESTION: And if, in fact, that is what the Department was requiring, can that serve as a justification?
GENERAL DAYS: What the—*I don't accept the characterization of the Court, but I won't dignify it by going into the details.* The point is, the Justice Department was doing what the Congress of the United States directed it to do and what the decisions of this Court have given the Attorney General the power to do.
(Emphasis added.)

House seats was increased from thirty-two to forty-two in the precleared version. In short, the 1992 plan represented the General Assembly's surrender to the black maximization policy of the DOJ. *Johnson III*, Tr. at 42.[28]

### C. Doing the Right Thing

The similarities between the reapportionment process involving the General Assembly and the State's congressional plan are undeniable. Therefore, after the Supreme Court decided *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, the legislative leadership in Georgia knew that part of the 1992 plan violated the Equal Protection Clause. The General Assembly acted to cure the constitutional violations by redistricting itself in a 1995 special session. The result, the 1995 plan, was submitted to the DOJ on November 15, 1995. The DOJ requested additional information relative to the redistricting process on December 22, 1995.[29] In its responsive submission, the State admitted:

It is clear that the 1991–92 House and Senate plans are subject to an attack pursuant to the law announced by the U.S. Supreme Court in *Johnson*. The redistricting process of 1991–92 which violated the Equal Protection Clause of the Constitution resulted not only in congressional redistricting, but also House and Senate redistricting.

The evidence is overwhelming that a number of redistricting decisions during that period were the direct and deliberate result of the DOJ's black maximization policy condemned in *Johnson*. The evidence is also uncontroverted that many of the district lines found violative in the congressional districts now struck down by the District Court in *Johnson* were actually based on House and Senate lines which were addressed in the 1995 special session.

*Johnson III*, Pl.Exh. 120–3, at 32. In other words, faced with the Supreme Court's decision in *Miller v. Johnson*, the State of Georgia properly recognized that parts of its 1992 plan were unconstitutional, and its 1995 plan represented an effort to correct those constitutional violations.

The DOJ was unwilling, however, to approve the State's 1995 plan. On March 15, 1996, the eve of the adjournment of the legislature's 1996 regular session, the DOJ issued a letter objecting to the 1995 plan. In its letter, the DOJ acknowledged the State's assertion that the plan's changes were made to comply with *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475. Nevertheless, it cursorily dismissed the State's argument, stating: "Neither the cited court decisions, nor any other court decisions, directly address the Georgia State House and Senate plans." *Johnson III*, Pl.Exh. 122, at 2. In resisting the State's effort to cure the constitutional defects of the 1992 plan, the DOJ dismissed the findings of the *Johnson I* Court, which were affirmed by the Supreme Court, by simply stating:

The Attorney General and the Department of Justice do not have a policy of requiring "maximization" of black voting strength; rather we evaluate each submitted voting change based on the available facts and existing law. Indeed, the absence of such a maximization policy is demonstrated by the 1991–92 state legislative redistricting process and our Section 5 review. Put simply, the redistricting plans precleared by the Attorney General in 1992 for both the State House and Senate created fewer majority-black districts than did various alternative plans, including the Brooks–McKinney, so-called "max-black" plan.

*Id.* at 2–3.

Based on its position that the 1992 legislative redistricting plan was not the product of

---

**28.** The visual ramifications of a policy that required racial goals to predominate over traditional districting principles are most dramatically revealed in the Eleventh Congressional District, S–10, S–11, H–131, H–140, H–141, H–173, and H–179. The references to S–11 as the "wave district" and to H–141 as the "district from hell" exemplify the twisted and contorted configurations of some majority black districts whose creation was forced by the DOJ.

**29.** The effect of that request was to extend the Attorney General's sixty-day deadline in which it is required to respond to a request for preclearance. *See* 42 U.S.C. § 1973c.

the same black maximization policy that had influenced the congressional districting plan, the DOJ used the 1992 plan as the retrogression benchmark against which to measure the 1995 plan. Thus, the DOJ rejected the 1995 plan because it decreased the number of majority black districts in both the House and the Senate from the 1992 plan.

The timing of the DOJ's March 15, 1996, objection letter was critical. The qualification of candidates for legislative office was scheduled for April 22–26, 1996, only five weeks away. Yet, the State of Georgia had no constitutional legislative districting plan in place for those elections. Its efforts to cure the constitutional defects it recognized in the 1992 plan had been thwarted by the DOJ's objections to the 1995 plan. The DOJ took steps seeking to block any use of the 1995 plan, attempting to force Georgia to elect its legislature under the 1992 plan, unconstitutional parts and all.

### D. *Section 5 Litigation*

Following its objection letter, on March 21, 1996, the DOJ filed a proceeding in the United States District Court for the Northern District of Georgia ("Northern District section 5 case"), seeking to enjoin the conduct of elections in Georgia under the unprecleared 1995 plan. *United States v. Georgia*, No. 1:96–CV–700 (N.D.Ga. filed March 21, 1996).

In that Northern District section 5 case, the initiating district judge sought the designation of a three-judge district court by the Chief Judge of the Eleventh Circuit Court of Appeals. Thereafter, the Chief Judge of the Eleventh Circuit Court of Appeals designated the same United States circuit judge and the same two United States district judges to act in the Northern District section 5 case as were designated in the present case (*Johnson III*). The wisdom of designating the same judges for both cases has been borne

out in the elimination of confusion and in streamlining proceedings which, because of time constraints, were conducted on a virtual emergency basis.[30]

At a hearing conducted in Atlanta on April 4, 1996, the three-judge district court in the Northern District section 5 case enjoined Georgia's legislative elections under the unprecleared 1995 plan, as the court was required to do by the Voting Rights Act and applicable case law. *United States v. Georgia*, No. 1:96–CV–700–JEC, 1996 WL 480861 (N.D.Ga. April 9, 1996) (order granting preliminary injunction) ("[T]his Court has no power to weigh the merits of the Attorney General's objections, but instead may determine only whether the plan has been precleared." (citing *Clark v. Roemer*, 500 U.S. 646, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991); *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981))). The effect of the injunction in the Northern District section 5 case left Georgia with only the 1992 plan to use in its forthcoming legislative elections.

In the Northern District section 5 case, the DOJ sought more than an injunction against Georgia's implementation of the 1995 plan. In addition, the DOJ requested an order prohibiting Georgia officials, who are also defendants in the present *Johnson III* lawsuit, from arguing in this proceeding that the unprecleared 1995 plan should be used as a remedial plan if the 1992 plan was held to be unconstitutional. The court refused that relief, declining to restrict any party's argument in the present case.

### E. *Preliminary Injunction Hearing*

Immediately following the April 4, 1996, injunction hearing in the Northern District section 5 case, a scheduling conference was conducted in *Johnson III*. Pursuant to that scheduling conference and after some pretrial proceedings conducted by the initiating

---

30. The time constraints of this case, because of the impending elections and this Court's concern that Georgia should have the popularly elected legislature mandated by its constitution, can hardly be overstated. The hearing dates have

been expedited and the length of hearing days extended. Day, night, and weekend facsimile transmissions, as well as Sunday conference calls, have been utilized to advance the proceedings.

judge, the hearing on Plaintiffs' motion for preliminary injunction was held in Augusta, Georgia, on April 16–18, 1996, and was continued in Atlanta, Georgia on April 23–24, 1996. The hearing was bifurcated generally along the lines of liability (unconstitutionality) and remedy.

In their amended complaint, Plaintiffs challenged twenty-three House and ten Senate districts in the 1992 legislative districting plan. Because of severe time limitations, for preliminary injunction purposes only, Plaintiffs narrowed their focus to sixteen House districts and seven Senate districts.[31] The State has conceded the unconstitutionality of each of these twenty-three districts.

Having insisted in the Northern District section 5 case that the State of Georgia use only the 1992 plan, the DOJ attorneys, under the most direct questioning by the Court at the close of the liability hearing, finally conceded the unconstitutionality of one House district (H–141) and one Senate district (S–11) in the 1992 plan, after earlier stating only that they would offer no evidence with respect to those two districts.[32] The Abrams Intervenors concurred with the DOJ's concession. By necessity, the concession of unconstitutionality of H–141 required the redrawing of the challenged H–140, because the two districts are integrally related to one another.

After the liability hearing in Augusta on April 16–18, 1996, and after the three judges had conferred, this Court informed the parties by telephone conference call on Sunday, April 21, 1996, of its decision, for preliminary injunctive purposes, on liability. In determining liability at this stage, the Court decided that Plaintiffs had abundantly established a substantial likelihood of success on the merits with regard to the unconstitutionality[33] of the following sixteen districts, districts for which injunctive relief is compelled:

Senate Districts: 10, 11, 55; and

House Districts: 111, 120, 121, 131, 133, 136, 140, 141, 158, 159, 173, 178, and 179.[34]

A separate remedy phase hearing was conducted on April 23–24, 1996, in Atlanta, Georgia, by agreement of the parties. During that interim remedy hearing, the Intervenors announced that, upon consideration, they would not oppose inclusion of the State's 1995 plan districts in the Court-ordered interim remedy for all districts not objected to in the DOJ's March 15, 1996, objection letter. This announcement narrowed the Court's focus in the remedy phase to thirteen districts to which the DOJ had interposed an objection in its March 15, 1996 letter. Those thirteen districts are: H–120, H–121, H–131, H–149, H–151, H–158, H–159, H–173, H–178, H–179, S–10, S–12, and S–55.

The Court had previously announced that ten of those thirteen districts, specifically H–120, H–121, H–131, H–158, H–159, H–173, H–178, H–179, S–10, and S–55, were unconstitutional. Plaintiffs and the State Defendants argued that because the DOJ's objections to those ten districts were premised upon a comparison to unconstitutional districts in the 1992 plan, the 1995 plan should be used for those ten districts as well. The Intervenors did not agree with that proposi-

---

**31.** Those were House Districts 93, 111, 120, 121, 131, 133, 136, 140, 141, 149, 151, 158, 159, 173, 178, and 179 and Senate Districts 2, 10, 11, 12, 25, 26, and 55.

**32.** The Intervenor–Defendants offered no evidence with respect to H–140, either.

**33.** Because the matter before us is a motion for preliminary injunctive relief instead of a request for permanent injunctive relief, we decide not whether the challenged districts in the 1992 plan are unconstitutional, but instead whether Plaintiffs have made a showing of a substantial likelihood of prevailing on the merits of their claim

that those districts are unconstitutional. *See, e.g., Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994). However, for brevity and ease of reference, we will use the term "unconstitutional" to describe and denote those sixteen House and Senate districts for which Plaintiffs have shown a substantial likelihood of success on the merits.

**34.** Specific findings of fact with regard to liability as to each district are set forth in the next section of this opinion.

tion as to all ten of the districts, but they did agree to use of the 1995 plan for H–121, H–131, and H–173. Thus, the remaining seven unconstitutional districts, to which the DOJ interposed objections, were still in controversy. The three districts that were not determined to be unconstitutional at this preliminary stage and which had been objected to in the March 15, 1996, letter were also still in controversy for purposes of determining their remedy configurations. Thus, at the conclusion of the hearing in Atlanta on April 24, 1996, it finally appeared that the Court, in the remedy phase, would have to deal with only ten remaining districts.

Accordingly, we have moved in this litigation from a starting point at which the DOJ sought to enjoin, for purposes of the upcoming election, the use of any part of the unprecleared 1995 plan, to a point at which the DOJ and the other Intervenors have essentially agreed to an interim remedy that would implement, for the time being, 226 of the 236 districts from the unprecleared 1995 plan.[35]

## IV. LIABILITY: THE PRELIMINARY INJUNCTION STANDARD

■ Plaintiffs have moved this Court for preliminary injunctive relief enjoining the upcoming elections for the Georgia House of Representatives and State Senate under the 1992 legislative districting plan. Although this case presents constitutional issues of the greatest importance to the citizens of Georgia, the standard for the issuance of a preliminary injunction is the same as in any other civil case. Before a preliminary injunction is granted, Plaintiffs must show the following:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable harm if the injunction were not granted;

(3) the threatened harm to plaintiffs outweighs the harm an injunction may cause the defendants; and

(4) the public interest will not be disserved by grant of a preliminary injunction.

*See, e.g., Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir.1994); *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 483 (11th Cir.1990).

It is noteworthy that the State of Georgia has conceded that the existing House and Senate plans are unconstitutional racial gerrymanders. Normally, such a concession between parties would be dispositive of the issues in a case, but this case also involves the intervening interests of the United States and certain registered voters. Because the practical effect of the State's concession is to invalidate the 1992 plan, the Court must carefully scrutinize that concession, especially in view of the State's request that the Court interpose the 1995 plan that has not been precleared under the Voting Rights Act.

■ Because of the public interests impacted by this case, we have given the most careful consideration to all aspects of the State's concession of unconstitutionality. We find the concession was made in good faith after thorough reflection upon the Supreme Court's decision in *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475. Indeed, we note that the State vigorously defended the 1992 redistricting process during the *Johnson I* litigation. Accordingly, there is no inference of collusion on the State's part in making its concession. Rather, we find the State's concession to be a responsible step in avoiding unnecessary and duplicative litigation and expense. Nevertheless, at least for purposes of preliminary injunctive relief, we have independently evaluated the constitutionality of each challenged district.

### A. Likelihood of Success on the Merits

In considering Plaintiffs' likelihood of success on the merits, the Court must first examine the merits of Plaintiffs' legal con-

---

**35.** By the time it ultimately agreed to use most of the 1995 plan, the DOJ was aware that Plaintiffs had presented a remedial plan that was less favorable to the interests pursued by the Intervenors than was the 1995 plan.

tentions. Plaintiffs' request for preliminary relief is premised on their allegation that twenty-three House and Senate districts as configured in the 1992 plan are racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment.

■ The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It prohibits the governmental classification of citizens on the basis of race, unless the classifications are narrowly tailored to achieve a compelling state interest. *E.g., Miller v. Johnson,* —— U.S. at ——, 115 S.Ct. at 2482. In the seminal case of *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), the Supreme Court recognized that, pursuant to this basic equal protection principle, a state cannot separate its citizens into different voting districts on the basis of race unless the redistricting decisions survive constitutional strict scrutiny. *See also Miller v. Johnson,* —— U.S. at ——, 115 S.Ct. at 2490 ("[W]here the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with equal protection mandates." (quoting *Shaw,* 509 U.S. at 647, 113 S.Ct. at 2827)).

### 1. *Race-based Decisionmaking*

■ To invoke constitutional strict scrutiny, a plaintiff must show that race was the "overriding, predominant force" in the redistricting process. *Johnson I,* 864 F.Supp. at 1372 (emphasis omitted). "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial consider-

ations." *Miller v. Johnson,* —— U.S. at ——, 115 S.Ct. at 2488.

The plaintiffs in *Shaw* proved race-based decisionmaking inferentially by showing districts so bizarre in shape and racially gerrymandered as to defy any other *raison d'être* except race. *Id.* at 643–45, 113 S.Ct. at 2825. Although some lawyers and a few judges interpreted *Shaw* to *require* a showing of bizarreness, the Supreme Court in *Miller v. Johnson,* —— U.S. at ——, 115 S.Ct. at 2486, rejected the proposition that a district must be bizarre on its face before there is a constitutional violation. The Court announced that while the bizarre appearance of a district was persuasive circumstantial evidence of its potential unconstitutionality, a showing by direct evidence, such as direct testimony from legislators about their motivations, may be even more persuasive. *Id.*

In this case, the record is replete with direct and circumstantial evidence that race was the predominant motivating factor in drawing the sixteen districts we have determined to be "unconstitutional." [36] The officials involved with the redistricting process testified that their only motivation in drafting the challenged districts in the 1992 plan was compliance with the DOJ objection letters. The goals of the DOJ, working closely with Ms. Wilde, were to create as many majority black districts as possible and to increase the percentage of black voting age population in those majority black districts that had not previously elected a black legislator to a point where such a result would be more likely.

In attempting to maximize the number of majority black districts, the DOJ dictated the number and location of these districts in its objection letters. Because there were not enough existing concentrations of black voters to allow the creation of the desired number of black districts in a manner consistent with traditional districting principles, the DOJ used computer-generated maps to ascertain where black populations were concen-

36. *See supra* note 33.

trated.[37] It then required the drawing of lines, using land bridges when necessary, to commandeer the necessary number of blacks into a district. In doing so, the DOJ regularly required the State to ignore governmental subdivisions, such as county and city lines. In some cases, compliance with its dictates required the otherwise unnecessary splitting of precincts. Indeed, several of these mandated majority black districts contain bizarre geographic features.

At the liability hearing, the DOJ sought to show that some of these gerrymandered concentrations of black population actually shared communities of interest existing in the district to which they had been imported. However, this argument is flawed because concern about particular communities of interest was not a motivating force behind the inclusion of blacks in such districts. Instead, that proffered rationale is simply an unsuccessful attempt to divert attention from the unyielding purpose of the DOJ, which was to create as many black districts as could be feasibly drawn.[38] Moreover, the evidence offered by the DOJ at the liability hearing in support of the existence of a particular community of interest in a given district was, itself, generally quite unpersuasive. What the Supreme Court said in *Miller v. Johnson* is precisely applicable here, as well: "It is apparent that it was not alleged shared interests but rather the object of maximizing the District's black population and obtaining Justice Department approval that in fact explained the General Assembly's actions." —— U.S. at ——, 115 S.Ct. at 2490.

An articulation of our findings on a district-by-district basis, delineating how and why each district was drawn, demonstrates that race was the predominant motivating factor in drawing each of the sixteen districts and that it subordinated traditional districting principles.

### 2. Analysis of Districts Found to be Unconstitutional [39]

#### i) Senate Districts 10 and 55

In the challenged 1992 plan, S–10 and S–55 are located largely in DeKalb County,[40] which is the second most populous county in Georgia. In the predecessor 1982 plan, DeKalb County had one majority black Senate district. At the beginning of the 1992 redistricting process, it was clear that DeKalb's black population had increased to the point where a second black district would be created naturally by the observance of traditional districting principles. Indeed, because blacks constituted approximately 42%[41] of the population of a county whose population entitled it to almost five Senate districts, the use of traditional districting principles also happened to create a number (two) of majority black districts in the county that was proportionally equivalent to the percentage of blacks in the county.[42]

Although this should have satisfied any desire by the DOJ for proportional representation, the DOJ was not content with just two majority black districts in DeKalb County, but insisted on the creation of three majority

**37.** For purposes of drawing majority black districts, the DOJ counted as white other non-black minority members, such as persons of Hispanic or Asian ancestry. For that reason, we use the term "majority black" instead of the term "majority-minority" throughout this opinion.

**38.** *See supra* note 26 for discussion of the DOJ's current argument that because more majority black districts than those created by the 1992 plan could have been drawn, the DOJ was not pursuing a black maximization strategy.

**39.** We will not discuss the evidence concerning those seven districts that we did not find to be unconstitutional. However, our denial of injunctive relief as to those districts obviously does not

mean that they will ultimately be determined to be constitutional.

**40.** S–10 contains a portion of Clayton County, which was included at the insistence of the DOJ to add enough blacks to create a third majority black seat in DeKalb County.

**41.** *See Johnson I*, 864 F.Supp. 1354, 1376 (noting that the black population in DeKalb County is 42.2%).

**42.** The 1990 census indicates that DeKalb County had 545,837 people. The ideal population for a Senate district is 115,682.

black districts. The DOJ sent two objection letters for that purpose before the State satisfied the DOJ's demands. The steps by which the State finally accomplished the drawing of a third district are described below.

In the first plan enacted and submitted to the DOJ,[43] two majority black districts existed in DeKalb County: S–55 and a Senate district that later came to be numbered as S–10.[44] S–10 was located entirely in DeKalb County.[45] Because DeKalb County did not have enough blacks to allow for the creation of a third majority black district, in its first objection letter, the DOJ directed the State to go into Clayton County, a county that was south and southwest of DeKalb, to pull out blacks from Clayton to be combined with the blacks in DeKalb County.[46]

Misunderstanding the directive of the DOJ, the State thought that the "community of interest" the DOJ believed blacks in Clayton County to enjoy with "residents of the adjacent black majority district" referred to black residents of College Park, a town in Fulton County, just west of the northwest corner of the point where Clayton borders Fulton. The Clayton County blacks enjoying the community of interest were assumed to be the West Clayton County blacks living adjacent to heavily black College Park. Accordingly, in the second plan,[47] State officials drew those blacks out of northwest Clayton and put them in the adjacent, majority black Fulton County Senate district that included College Park.

This misstep by the State meant that DeKalb County still did not have a third majority black district,[48] so the DOJ was more direct in its second objection letter, requiring that blacks in Clayton County be pulled out and joined with black neighborhoods in DeKalb County in order to create three majority black districts in that county.[49] This time the State understood the directive and proceeded to draw blacks out of S–44 in Clayton County in sufficient numbers to join them with other black communities in S–10, thereby importing enough black voters to allow the creation of a third majority black district in DeKalb County.

**43.** The "first plan" refers to Act No. EX29 of the 1991 Extraordinary Session, which was the first plan submitted to the DOJ for preclearance.

**44.** S–10 was originally numbered as S–5.

**45.** *Johnson III*, Tr. at 166. In the first plan, the percentages of minority population were 68.64% black total population ("BTP") and 64.64% black voting age population ("BVAP"). In the first plan submitted for Senate District 55, the percentages of minority population were 50.23% BTP and 46.28% BVAP.

**46.** In response to the first plan, the DOJ objection letter informed Georgia that:

The Senate plan likewise includes instances in which the concerns of the incumbents were placed ahead of black voting potential. In the DeKalb/Clayton Counties area (proposed District 44) ... it appears that protection of incumbents motivated the fragmentation of concentrations of black residents who clearly have a community of interest with the residents of the adjacent black majority district.

*Johnson III*, Pl.Exh. 139, at 4.

**47.** The "second plan" refers to Act Nos. 615 & 616 of the 1992 Regular Session, which was the second plan submitted to the Attorney General for preclearance.

**48.** In the second plan, the percentage of minority population remained almost the same in S–10 (68.70% BTP and 64.42% BVAP) and increased slightly in S–55 (53.16% BTP and 49.76% BVAP).

**49.** In response to the second plan, the DOJ objection letter informed Georgia that:

The Senate plan also continues to include instances in which the concerns of the incumbents were placed ahead of black voting potential. For example, in the DeKalb/Clayton Counties area it appears that protection of incumbents motivated the legislature to combine portions of Clayton County with Fulton County resulting in fragmentation of concentrations of black residents into four surrounding white majority districts in the Atlanta/DeKalb metro area (Districts 34, 42, 44, and 55). *By failing to combine the black growth communities in Clayton County with the residents of the black neighborhoods in DeKalb, the state has minimized black voting potential in DeKalb County where three rather than two black voting age majority districts would have been the logical result of boundary lines that fairly recognize black voting strength in that area.*

In the 1982 plan, S–44 had consisted almost entirely of Clayton County.[50] Indeed, Senator Terrell Starr had represented constituents from these extracted Clayton neighborhoods since 1969. In determining which people should be pulled out of Clayton and put into DeKalb, race was the only consideration. Ms. Meggers began by moving the S–10 line south of DeKalb County to pick up black voters in the immediately adjacent section of Clayton County. She then drew a thin land bridge across a sliver of Clayton, leaping over large contiguous chunks of non-black population, to pick up the entire western quarter of Clayton County. In finding and extracting this black population, she carefully picked black census blocks and split precincts along racial lines in order to give DeKalb County the necessary number of blacks to create a third majority black district. Thus, infused with blacks from Clayton County, S–10 remained majority black and was itself able to free up some blacks for S–55, which now also became majority black. S–43, previously drawn as a majority black district, remained so in this third and final reconfiguration of the Senate districts. Its demands met, the DOJ accepted the redistricting of these districts.

In short, Plaintiffs have offered compelling evidence that race was the only factor in reconfiguring these districts and that consideration of race subverted all other traditional redistricting principles. In attempting to rebut this evidence, the Intervenors introduced evidence that the extracted areas of Clayton County arguably constituted a community of interest with the DeKalb core of S–10 to which they had been joined. Senator Nadine

Thomas, who lives in the southern part of DeKalb County and who now represents S–10, testified that there was a community of interest between those two areas. She based her assessment on the fact that high schools in the two areas sometimes compete against each other in sporting events. Further, she shops, as she believes do some of her DeKalb constituents, at a J.C. Penney's Outlet Store and at Southlake Mall,[51] both of which are located in Clayton County.

The Court concludes that Intervenors have not produced any evidence that the desire to join communities of interest in any way motivated the State in its siphoning of blacks out of Clayton County and into S–10. Senator Thomas was not a State senator in 1991,[52] and hence she was not aware of the factors motivating the particular configuration of the district. The undisputed evidence indicates that the State's marching orders from the DOJ essentially were to find enough blacks in Clayton County to create a third majority black district for DeKalb County. When Ms. Meggers was splitting precincts and identifying majority black census blocks, a desire to find communities of interest was not even a remote consideration. Instead, in determining which Clayton residents should stay in S–44 and which should be moved to S–10, she looked only to the race of the residents.

Intervenors have not offered any persuasive evidence that the extracted areas of Clayton County had any communities of interest with DeKalb County. Senator Starr, who has lived in Clayton County all his life, was aware of no such community of interest. Indeed, he testified that his black "seat mate"[53] at the time thought the transfer of

*Johnson III*, Pl.Exh. 143, at 2–3 (emphasis added).

50. In 1982, S–44 also included a tiny part of DeKalb County. The testimony indicated generally that counties must sometimes be split to comply with the one-person one-vote dictates of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Neither side has argued that race constituted any factor in the inclusion of this tiny section in 1982.

51. Senator Thomas did acknowledge that another mall in DeKalb County, South DeKalb Mall, is

closer to south DeKalb residents, but she sometimes preferred Southlake Mall because it had more stores.

52. Although she served in the Georgia House of Representatives at the time of the 1991–92 redistricting process, Senator Thomas testified that she had no involvement in the drawing of the lines for the Senate seat that she ultimately sought and won.

53. According to the Court's understanding, a legislator's seat mate is the person who sits next to him or her in the legislature.

part of Clayton into DeKalb S–10 was illogical. Moreover, Senator Nadine Thomas, who has resided in DeKalb County since 1976, appeared unaware of any extensive community of interests between DeKalb and the S–10 portions of Clayton County prior to her candidacy for Senator of the newly created district. She testified she had been surprised to find "a pocket of black people in Clayton County." It would be more than a little curious if DOJ attorneys in Washington, D.C., were aware of a community of interests unknown to longtime residents of the area.

Beyond the testimony of the witnesses, an examination of the map and demographic evidence belies any persuasive argument that all of the Clayton County portions of S–10 had any communities of interest with the DeKalb portion. S–10, as finally created in the 1992 plan, is not compact and, given the densely populated metro area in which it is located, is unnecessarily sprawling. Although a portion of the Clayton County part of S–10 is adjacent to DeKalb County, the bulk of the Clayton County section, which is the northwestern part of that county, is adjacent to Fulton County and does not even touch DeKalb County. (In Senate District 10, the northwestern part of Clayton County is connected to the northeastern part of the county by only a narrow land bridge.) If the western section of Clayton County has any communities of interest with the neighborhoods of another county, it would be with Fulton County, the county on which this section primarily borders. Indeed, it is not surprising that State officials misconstrued the DOJ's directive to join black communities of interest to mean that the DOJ wished to combine the black portion of northwest Clayton County with the adjacent and heavily black College Park section of south Fulton County in S–35. Moreover, to the extent that the black communities of the DeKalb County portion of S–10 have communities of

interest with black communities in another county sufficient to override a governmental county subdivision, those would appear more likely to exist with areas in the adjacent and heavily black Fulton County S–36,[54] not with black communities in northwest Clayton County that are not even contiguous and are miles away.[55]

This Court concludes that race was the predominant, overriding factor explaining the configuration of S–10 and S–55 in the 1992 plan. The changes in these districts were made solely to meet the demands of the DOJ, whose objection letters insisted on the creation of three majority black Senate districts in DeKalb County. Additionally, the Court concludes that traditional Georgia redistricting principles, including a respect for political subdivisions, were subverted to the DOJ's overarching racial motivation. That subversion resulted in the creation of a Senate district that straddled two urban counties in a manner that was not present in the 1982 plan and that would not have occurred but for the desire of the DOJ to create a third black district in DeKalb County, something which could not be accomplished solely through the use of the existing black population in DeKalb County.

ii) *Senate District 11*

S–11 is located in southwest Georgia. Although that part of Georgia is sparsely populated, which means that whole counties can generally be used to draw most of a district, the 1992 plan split eight of the ten counties located in the district. S–11 has been described as the "wave district" because of a wave-like configuration of crests and troughs that tracks the black populations in these counties. Intervenors have conceded that this district is unconstitutional. Accordingly, we will discuss it no further.

iii) *House Districts 111, 120 and 121*

H–111, H–120, and H–121 are contiguous districts that lie in east central Georgia and

54. These observations, however, should not suggest that the Court has concluded at this time that there is any community of interest between northwest Clayton County and College Park or between South DeKalb and its South Fulton neighbors.

55. One can reasonably infer that the DOJ calculated that the depletion of blacks in S–36 or S–35 would have eliminated or unacceptably reduced a majority black district somewhere else.

must be considered together inasmuch as their populations were swapped among each other during the redistricting process that produced the 1992 plan. Integral to implementation of the max-black plan was the creation of majority black districts in rural Georgia. The Black Caucus had observed that there were several black legislators from metropolitan areas, but thus far there had not been enough rural black legislators. Hence, they sought districting plans that would ensure the election of as many black rural legislators as possible.

In the 1982 plan, as supplemented by the 1990 census, two predecessor districts in this area[56] were majority black in total black population and one was majority black in black voting age population: H–106 had 50.84% BTP and 45.90% BVAP, while H–108 had 55.82% BTP and 51.35% BVAP. Notwithstanding the majority BVAP status of one of these districts, it had continued to elect a white legislator. Therefore, it was thought that in order to increase the likelihood of the election of black legislators in this area, the number of blacks in that district had to be increased. Indeed, according to Ms. Meggers, if the previous majority black district had elected a black representative, there would not have been the same need to achieve high BVAP numbers in these districts; these high numbers were sought

specifically to increase the likelihood of a different result in the next election.[57]

Therefore, in the first 1991 plan, two heavily majority black districts and two heavily majority white districts were drawn:

|       | BTP   | BVAP  |
|-------|-------|-------|
| H–111 | 62.67 | 57.88 |
| H–116 | 36.83 | 33.73 |
| H–120 | 60.01 | 55.54 |
| H–121 | 29.82 | 26.67 |

The DOJ rejected this first plan purportedly because Burke County had been split into three districts. (In actuality, Burke had been split only two ways, the same number of ways it had been split in 1982.) The State went back to the drawing board and in the second plan moved Burke completely out of H–120 and redrew the other lines, creating three majority BVAP districts, as follows:

|       | BTP   | BVAP  |
|-------|-------|-------|
| H–111 | 54.45 | 50.11 |
| H–116 | 58.18 | 54.08 |
| H–120 | 36.92 | 34.70 |
| H–121 | 62.60 | 58.84 |

The DOJ again refused to preclear the plan, but only because of its concern about the racial composition of a local legislative delegation from a different district in this area. Responding to its concerns about that nearby district apparently had no effect on these district lines,[58] and the districts were finally precleared. In the present proceed-

---

**56.** Because of the change in numbers from the 1982 plan, the first 1991 plan, the second 1992 plan, the third 1992 plan, and the 1995 plan, as well as the concomitant swapping of counties in each iteration, it is impossible to compare precisely each 1992 final plan district or 1995 plan to its predecessor 1982 plan district, as the counties included change somewhat. It appears, however, that there are four core districts that may be compared insofar as the number of majority black districts is concerned. In the 1982 plan, as supplemented by the 1990 census, those districts are as follows:

|        | 1982  |       |        | 1992 Final Plan |       |
|--------|-------|-------|--------|-------|-------|
|        | BTP   | BVAP  |        | BTP   | BVAP  |
| H–82   | 43.71 | 40.46 | H–111  | 54.45 | 50.11 |
| H–84   | 29.51 | 27.67 | H–112  | 33.70 | 31.18 |
| H–108  | 55.82 | 51.35 | H–120  | 36.92 | 34.70 |
| H–106  | 50.84 | 45.90 | H–121  | 62.60 | 58.84 |
|        |       |       | H–116  | 58.18 | 54.08 |

In short, there were two majority BTP districts and one majority BVAP district under the 1982

plan. Under the 1992 final plan, there were three BTP districts and three BVAP districts. H–111, H–120, and H–121 have been challenged in this proceeding; H–116 has not.

**57.** This effort appears not to have succeeded. David Simmons, a black resident of Milledgeville, testified that he ran for H–121 in 1992 and received approximately 39% of the vote. Mr. Simmons ran again in 1994 for S–25 and received 48% of the vote.

**58.** The DOJ was concerned that the State had included a land bridge through Richmond County that would allow whites in that county to have a majority of white legislators (four) over the number of black legislators (three) in the county legislative delegation. The DOJ wanted three majority black and three majority white districts in the Richmond County delegation. In response to the DOJ's letter, the State of Georgia moved the land bridge from Richmond County over the Richmond–McDuffie County line into McDuffie

ing, H–111, H–120, and H–121 are at issue; H–116 is not challenged here.[59]

Ms. Meggers testified, and this Court finds, that in the drawing of these district lines, racial considerations predominated and subverted traditional districting principles. In order to achieve black maximization, and guided solely by the racial composition of census tracts, the State was forced to ignore city lines and, in some cases, even precinct lines. The splitting of precincts required the creation of additional precincts. Ultimately, the splintering of precinct lines created havoc for voters and election officials.

Three particular gerrymanders created to enhance black population are especially worthy of mention. First, in H–111, the final 1992 plan splits off the panhandle portion of Warren County in order to remove white voters who live there. In both the 1982 plan and the 1995 plan, Warren County had not been split. Second, H–120 in the 1992 plan utilizes a narrow, jutting protrusion that splits two counties.

Third, in order to create a majority black district in H–121, the State had to pull white voters from that district and put them into H–122. It also had to go into the City of Milledgeville and split it along racial lines in order to gain enough blacks to create a majority black district. Milledgeville is located in a county that, in the past and currently, has had to be split because its population exceeds the number appropriate for a House district. Nevertheless, in the past, Milledgeville itself had not been split and had been wholly included within a district that also included the western part of Baldwin County.

(Because the 1995 plan contains a similar district, it appears that population concerns would have permitted that traditional drawing of a district wholly including Milledgeville in the 1992 plan.) However, in the 1992 plan, Milledgeville was split in a meandering fashion solely for racial reasons. Moreover, the 1992 plan joined parts of Milledgeville, a city with a large hospital and a college, with the economically depressed county of Hancock, something not done in the 1982 plan.

iv) *House District 131*

In the 1992 plan, H–131 is comprised of parts of Meriwether, Coweta and Troup Counties. The overall appearance of H–131 is similar to that of a pinwheel with tentacle-like extensions into Coweta, Troup and the southern portion of Meriwether Counties. In the final 1992 plan, the black population percentages were 60.07% BTP and 55.68% BVAP.[60] Aware from DOJ official John Dunne's comments at the Baltimore meeting that if it could draw a majority black district, it must do so, the State drew this district, which was contained in the max-black plan, for the purpose of creating a new majority black district.

In the 1982 plan, the predecessor district, H–91, was quite regularly shaped and included two whole counties—Meriwether County and Talbot County—as well as a small contiguous portion of Coweta County that was presumably added for population reasons, *i.e.,* to comply with the one-person one-vote requirement.

No longer regularly shaped, H–131 in the 1992 plan unnecessarily splits Meriwether

County to pick up black population in Columbia County, which resulted in the district lines that ultimately received preclearance.

**59.** As noted, the black population in the predecessor to H–116 was also shored up during the 1991–92 process. In the 1982 plan, H–108, which included Burke and Jefferson Counties, had BTP/BVAP, as supplemented with the 1990 census, respectively, of 55.82/51.35%. In the final 1992 plan, this district essentially became H–116, which included Burke and part of Richmond Counties, and the black population was

pumped up to 58.18/54.08%. Jefferson County was then put into H–120 in the final 1992 plan.

**60.** In the first plan, the percentage of black population was 58.78% BTP and 54.29% BVAP. From its inception, the configuration of H–131 had closely mirrored the proposed max-black plan and hence there was no objection by the DOJ. The evidence does not indicate what prompted the second reconfiguration of the district, which resulted in a slight increase in black population.

County, which, with 22,000 people, could have been used in its entirety, as it had been used in 1982, to make up part of the approximately 35,990 people required for a House district. Instead, the 1992 plan puts most of the top two-thirds of the county into H–131, but the lower part of the county, which contained the white population, is excluded, except for a tentacle-like land bridge reaching across the white population areas into the southern part of the county, which was drawn solely in order to pick up black population.

Because Meriwether County was not populous enough to make up its own district, under any plan it would have had to borrow some people from one of its more populous neighbors, Troup or Coweta Counties. In the 1992 plan, however, Meriwether was joined with and split both of those counties. First, Meriwether was joined with Troup by a tentacle-like land bridge designed to reach into the City of LaGrange and pull out the black population of that city, thereby splitting it. In Coweta County, while the tentacle does not contain a land bridge *per se*, the district narrows and widens after entering the City of Newnan and picking up its black population. In the 1992 plan, Coweta County, which has a population of almost 54,000, enough for one and one-half House districts, is split into four House Districts: H–131, H–103, H–104, and H–106.

Although Intervenors presented testimony that there were arguable communities of interest between the H–131 sections of Meriwether, Coweta, and Troup Counties, they presented no evidence that joining communities of interest was ever a consideration in

the drawing of this district.[61] Instead, the remarks by John Dunne at the Baltimore meeting, which caused State officials to believe that they must comply with the max-black plan in order to obtain preclearance, precipitated the drawing of a majority black district in this area. Race was the predominant, overriding factor driving the configuration of this district and trumping traditional redistricting principles.

### v) *House Districts 133 and 136*

In the 1992 plan, H–133 and H–136 are located in the southern portion of Muscogee County, which has a population of almost 180,000 people. Both are majority black districts. H–134, not at issue here, is also located in southern Muscogee, between H–133 and H–136, and is also a majority black district.[62]

H–133 and H–136 were the subject of three DOJ objection letters. The DOJ's unwillingness to.approve these districts after submission of the State's third plan delayed preclearance of the entire 1992 House plan. After the State finally acceded to the DOJ's demand regarding these districts, the DOJ precleared the entire House plan. The gist of the problems encountered in drawing districts acceptable to the DOJ is rather simple. Muscogee County has the requisite population for five house districts. The DOJ insisted that three of these districts, or 60% of the county delegation, be majority black districts. Because blacks are only 38% of Muscogee County's population, drawing district lines that gave them 60% of the districts was quite a challenge for Ms. Meggers. She did ac-

---

61. At the liability hearing, the Court heard testimony from Representative Carl Edwin Von Epps, Jr., who was elected to represent H–131 in 1992 and was reelected in 1994. Representative Von Epps testified that an arguable community of interest existed between these three counties in that members of black civic organizations, such as the Eastern Star and Sons of LaGrange, lived in parts of the three counties placed in the district. On cross examination, however, Representative Von Epps was unable to state that the

lines were drawn with the purpose of bringing members of identified civic groups into the district, as opposed to the State's explanation that the lines were drawn to bring in blacks, some of whom may have been discovered, after-the-fact, to share communities of interest.

62. The percentage of black population in H–133 is currently 57.23% BTP and 54.33% BVAP. H–136 has a 57.77% BTP and 53.97% BVAP. H–134 has a 54.05% BTP and 50.10% BVAP.

complish it.[63]

In the first plan submitted to the DOJ, H–133's black population percentage numbers were 24.84% BTP and 22.14% BVAP. H–136's black population percentage numbers were 60.85% BTP and 57.03% BVAP. In response to submission of the first plan, the DOJ stated that:

> In the Muscogee region, in following the arbitrary and discriminatory work group lines in drawing five districts internally within Muscogee County, the state avoided serious consideration of *alternative plans* which create a third district in the Muscogee and Chattahoochee Counties area which would provide black voters with an equal opportunity to participate [64] in the political process and elect a candidate of their choice to office.

*Johnson III*, Pl.Exh. 139, at 4 (emphasis added). Whenever the DOJ used the phrase "alternative plan" or "alternative plans," State officials understood it to mean the max-black plan.

The second plan submitted to the DOJ contained significant increases in black population in H–133 and H–136.[65] Again, the DOJ remarked upon this district in its letter denying preclearance: "[I]n the Muscogee/Chattahoochee area, the state failed to remedy our concern that *three viable black voting age majority districts were not drawn in this area* due to inappropriate incumbency considerations." *Johnson III*, Pl.Exh. 143, at 2 (emphasis added).

In response, the State of Georgia once again adjusted the lines to ratchet up the black population in H–133. In the third sub-

mission regarding these districts, H–133 had a 53.08% BTP and 49.80% BVAP; H–136 had a 60.10% BTP and 56.47% BVAP. The DOJ, however, still was not satisfied; it informed the State of Georgia of the following concern:

> [W]e still have a concern in one area of the state. It appears that the state continues to elevate incumbency concerns above minority voting rights in the Muscogee–Chattahoochee Counties area. As you know, *the original objection suggested that three viable black districts could be drawn in this area and that the state rejected such an approach without any legitimate reason for doing so.*
>
> In the instant submission, the state continues to pack the existing black majority districts at the expense of the third district and exacerbates this problem by inexplicably drawing a "duckhead-shaped" boundary configuration north into District No. 135, in order to draw a white incumbent into District No. 133. *While incumbency considerations are not per se objectionable,* in this case, a significant white population was added to District No. 133 in order to include the incumbent's residence. The resulting configuration dilutes minority voting strength.
>
> In the short time we have had to analyze the boundary changes, this is the only area in the House plan that we find that does not satisfy Section 5.

*Johnson III*, Pl.Exh. 145, at 1–2 (emphasis added). Thus, by that objection letter, the DOJ relegated incumbency considerations, a traditional redistricting principle, to a consideration that was merely "not per se objectionable," so long as it did not interfere with

---

**63.** Indeed, at the hearing, the Court was initially skeptical that such a feat could be accomplished mathematically. Ms. Meggers insisted, with self-evident pride, however, that through the most "skillful" machinations employed during the entire redistricting process, she was able to accomplish that, which, on its face, would seem quite difficult. The existence of three majority black districts in this area confirms Ms. Meggers' redistricting skills and also establishes the great lengths to which the DOJ was willing to go to force the State of Georgia to racially gerrymander its district lines.

**64.** The DOJ was never able to explain to the Court how requiring that 38% of the population control 60% of the districts constitutes "an equal opportunity to participate in the political process."

**65.** H–133 increased to 50.25% BTP and 45.05% BVAP. H–136 increased to 66.87% BTP and 64.04% BVAP.

the DOJ's black maximization policy, which was to predominate over all else.

In response to that final objection, the State of Georgia again cranked up the black population in H–133 from 53.08% BTP and 49.80% BVAP to 57.23% BTP and 54.33% BVAP. H–136 remained at 60.10% BTP and 56.47% BVAP. Regarding these districts, Ms. Meggers testified that the increases in the black population were solely for the purpose of meeting the DOJ's black maximization demands.

In regard to H–133 and H–136, this Court readily concludes that racial considerations predominated over all other traditional redistricting principles because of the DOJ's insistence that the 38% black population control 60% of the legislative districts of Muscogee County.

vi) *House Districts 140 and 141*

H–140 and H–141 are adjacent districts in central Georgia. H–141, known to State reapportionment aficionados as the "district from hell," has an extremely odd configuration resembling an ink blot on a Rorschach test. This district, which began as a district with 25% BVAP, and ended as a 54% BVAP district,[66] was configured to create one of the six black rural house districts sought in the max-black plan. Because Intervenors have conceded the unconstitutionality of this district, the Court will discuss it no further, except as it bears on H–140.

In the 1992 plan, H–140, which abuts H–141 to the west, includes the entire area of

Macon County and parts of Crawford, Taylor, Peach, Schley, and Dooley Counties. Although Intervenors have not conceded the unconstitutionality of H–140, in response to a direct question about their position on this district, they noted that they would not be presenting any evidence that the district is constitutional. In addition, Intervenors acknowledged that H–140 would have to be redrawn as a result of the necessary reconfiguration of H–141, whose unconstitutionality they have conceded. Given the strength of the evidence supporting an inference of unconstitutionality, the Intervenors' decision not to present evidence is the practical equivalent of a concession. Nevertheless, the Court will briefly discuss this district.

H–140 and H–141 must be considered together as they lie next to each other in the same part of the state, were both targeted as potential majority black districts, and, during the objection process, were treated as one area by the DOJ. In the first plan submitted to the DOJ, H–140 had 19.91% BVAP; as noted H–141 had approximately 25% BVAP. The DOJ objected, articulating its desire for more majority black districts.[67]

In response to this objection, the State of Georgia redrew both districts and increased the black population of each. H–140 increased from 19.91% BVAP to 69.36% BVAP.[68] H–141 increased from 25.35% BVAP to 30.94% BVAP.

These adjustments still did not satisfy the DOJ. In the second objection letter, the

---

**66.** H–141 had 27.95% BTP and 25.35% BVAP under this first plan. In the second plan, the black population in the district increased to 33.44% BTP and to 30.94% BVAP. After a second objection by the DOJ, the third and final plan provided for 59.04% BTP and 54.03% BVAP.

**67.** The DOJ stated:
[I]n the Peach ... Count[y] area, the proposed plan fails to recognize black population concentrations although *reasonable alternative configurations of boundary lines would permit additional districts that would provide black voters the opportunity to elect candidates of their choice.* While we have noted the state's

assertion that the division of the black community in these areas *into several districts* enhances black voting strength by providing black voters an opportunity to influence elections in additional districts, it appears that the plan in fact was designed to ensure *the re-election of white incumbents.*
*Johnson III,* Pl.Exh. 139, at 3 (emphasis added). As did the State officials, the Court interprets the emphasized words to mean that the DOJ wanted additional majority black districts consistent with the max-black plan.

**68.** The BTP increased from 22.93% to 72.05%.

DOJ again expressed its displeasure.[69] As a result of that letter, the State of Georgia adjusted the black population in these and related districts, by reducing the black population in H–140 and increasing the black population in H–141. H–140 went from a 69.36% BVAP to 64.43% BVAP. H–141 increased from a 30.94% BVAP to 54.03% BVAP. That satisfied the DOJ's demands.

Due to the high BTP and BVAP in H–140, it was referred to as the "gangbuster" district by parties involved in reapportionment. In order to achieve that result, five counties—Dooley, Schley, Peach, Taylor, and Crawford—were split. Only slightly less odd in appearance than H–141, H–140 has extensions into these split counties that are highly irregular in shape and track black population through the counties. Representative Bob Hanner, who was the Chair of the House Reapportionment Committee during the redistricting process, testified that H–140 was the "most frustrating district of all." He was particularly disturbed by the fact that so many counties were split in H–140. Intervenors put on no evidence concerning this district.

This Court concludes that Plaintiffs have presented sufficient evidence from which to conclude that race was the predominant, overriding factor in creating H–140. Traditional redistricting principles were subordinated in the effort to satisfy the DOJ's objections. Specifically, the State of Georgia shifted and reshifted the black population among districts in order to achieve the DOJ's demand for two majority black districts in this area.

vii) *House Districts 158 and 159*

In the 1992 plan, H–158 and H–159 are located in southwest Georgia.[70] Predecessor districts in the 1982 plan had one majority black district and one black influence district.[71] Proponents of the max-black plan sought to transform the black influence district into a majority black district. Drawing lines in observance of traditional districting principles could not, however, achieve that result.

Ms. Meggers testified that, although there were enough blacks to create one majority black district out of these two districts, using whole counties to form districts, there were not enough blacks to create two majority black districts using whole counties. Gerrymandering into adjacent counties to pull out black pockets of populations in those counties was essential to accomplishing the goal of black maximization. The history of these districts' redistricting is as follows.

In the first plan, H–158's black population figures were 47.46% BTP and 42.68% BVAP. H–159's black population figures were 60.61% BTP and 56.08% BVAP. Accordingly, the first plan created one majority black district. The DOJ rejected the configuration of these districts, in essence, because H–159 did not include black voters from nearby

---

**69.** The DOJ stated:

In response to our objection to the failure of the state to recognize black population concentrations in the Peach/Houston area, the state submitted proposed District 140, referred to as the "Heart of Georgia" district. While the state maintains that this district is the "first viable rural Georgia minority House district in the modern history of the General Assembly," the fact is that the adopted plan continues to fragment and submerge significant black population concentrations. The state chose to draw the "Heart of Georgia" district into Peach County and divided the Houston County black voters among three majority white districts. Consequently, the proposed plan minimizes overall black voting strength in the heart of Georgia in an effort to protect an incumbent

legislator. The state fails to articulate a legitimate nonracial reason for rejecting alternative plans which remedy the fragmentation and provide *two viable black voting age majority districts in this area.*
*Johnson III*, Pl.Exh. 143, at 2 (emphasis added).

**70.** H–158 is composed of five whole counties: Stewart, Quitman, Randolph, Clay and Calhoun, and parts of four counties: Marion, Early, Baker, and Mitchell. H–159 is composed of two whole counties, Terrell and Webster, and part of two counties, Sumter and Lee.

**71.** Those predecessor districts were H–130, which had 55.34% BTP and 51.30% BVAP, and H–131, which had 47.80% BTP and 44.76% BVAP.

areas that the DOJ wanted to be included in the district.[72]

After receiving the DOJ's objection letter, the General Assembly redrew the districts. In H–158, the black population decreased from 47.46% BTP and 42.68% BVAP to 42.66% BTP and 38.55% BVAP. That decrease was made in order to increase H–159's black population figures from 60.61% BTP and 56.08% BVAP to 65.26% BTP and 60.72% BVAP.

With regard to the enhancement of black population in H–159, it was the goal of black maximization proponents, including the DOJ, not only to create as many majority black districts as possible, but also to enhance each such district with the maximum available black voting age residents. From the testimony and argument of the DOJ in the current proceeding, it appears that the DOJ believes that until a majority black district elects a black representative, it has not achieved its full potential. Accordingly, during the redistricting process, it was a source of some concern and chagrin to the DOJ that a majority black district, such as the predecessor district in this area, had continued to reelect a white incumbent. Hence, there arose the perceived need by the DOJ to enhance further the black population in those districts that had continued to elect white legislators and the perceived value of a racially enhanced district, such as H–159.[73]

Even though the second plan increased the black population figures for H–159, the DOJ was still unsatisfied and made clear its insistence that H–158 and H–159 both be majority black districts.[74] As a result of this objection, the State of Georgia again redrew these districts. In H–158, the black population percentages increased from 42.66% BTP and 38.55% BVAP to 63.64% BTP and 58.81% BVAP. In H–159, the black population percentages decreased somewhat from 65.26% BTP and 60.72% BVAP to 62.27% BTP and 57.48% BVAP. With that re-engineering of the numbers, the DOJ was finally satisfied with these two districts, which were now both majority black.

Although the details of the reconfigurations necessary to get H–158 and H–159 to their final state in the 1992 plan are too numerous and complicated to describe in this opinion, one of the most important contrivances used to arrive at the race numbers necessary to satisfy finally the DOJ as to H–159 was the extension of that district into Americus. It was done solely for the purpose of extracting enough blacks to enhance further the black population of H–159. Am-

72. In response to the first plan, the DOJ stated:
    In the southwest region involving proposed House District 159 ... the proposed plan fails to recognize black population concentrations although reasonable alternative configurations of boundary lines would permit additional districts that would provide black voters the opportunity to elect candidates of their choice. While we have noted the state's assertion that the division of the black community in these areas into several districts enhances black voting strength by providing black voters an opportunity to influence elections in additional districts, it appears that the plan in fact was designed to ensure the re-election of white incumbents.
    *Johnson III*, Pl.Exh. 139, at 3.

73. Ms. Meggers testified that H–159 had been 52% black in the 1982 plan (this number is apparently unsupplemented by the 1990 census) and was "packed" as a 60% black district in the first plan because no black had been elected in modern time from this area and because election of a black here was a primary goal of the max-

black proponents. As a postscript to this narrative, the DOJ's efforts to have a black elected in these two districts were unsuccessful; the white incumbents in these two heavily black districts have been reelected notwithstanding the black population increases that the DOJ insisted upon.

74. The DOJ responded in its second objection letter:
    In the proposed House plan for the rural southwest region, we originally found that black concentrations were fragmented to ensure the re-election of white incumbents and that an additional black district could have been drawn. In response to our objection, the state simply moved black population into District 159 at the expense of the black population of proposed District 158. We are aware that there were alternative plans presented to the legislature that remedy this fragmentation and which provide two black voting age majority districts in this area.
    *Johnson III*, Pl.Exh. 143, at 2.

ericus is the county seat of Sumter County, which in 1982 had occupied, by itself, its own House district. The representative from H–159, Representative Hanner, testified that the interests of Americus, which has a regional hospital and a college, differ from those of the "bottom" or rural part of the district.

To pull out the necessary number of blacks, and to avoid pulling out a significant number of whites, a crooked "sliver" was pushed into Americus, which has resulted in a very confusing split of that city. Representative Hanner testified that even he cannot identify all the lines in Americus because they wind around so much. Testimony indicated that a caller from the NAACP was likewise having trouble figuring out the district lines. Senator Hooks,[75] whose family has lived in the area for seven generations and who believes that he is the only individual who has figured out where the boundary lines of the districts are, testified that the bizarre lines have created such confusion that, in one election, he and his wife were given ballots for different House districts. Senator Hooks noted that the county commission had bought about 150 voting machines and still has been unable to sort out the ballot permutations inherent in the confused system.[76] Ms. Meggers also testified that the convoluted district lines have caused much confusion among residents and election officials.

With regard to H–158, Ms. Meggers testified that it was drawn in its present iteration only to placate the DOJ. She noted that the district has some really strange lines in the Mitchell County part of it and that at one point only a river bridge connects two parts of the district. One part of H–158 has no road connecting it with the adjacent, "land bridge" part of the district with the result that the elected representative had to travel by road through H–161 in order to get from one side of H–158 to the other.

The evidence overwhelmingly indicates that, in the final configuration of these two oddly configured districts, race was the only consideration; it trumped all non-racial districting principles. As Senator Hooks explained H–159, the lines travel through the graveyard in Americus and separate the blacks and whites "house by house, block by block, swamp by swamp."

viii) *House District 173*

In the 1992 plan, H–173 is located in southeast Georgia along the coast. It is composed of one whole county, McIntosh, and part of Liberty and Glynn Counties. The Glynn County portion of H–173 is a narrow appendage that was fairly described by a witness as a boot with a big toe. At one point, the Glynn County portion is only one census block wide.

In 1982, the predecessor district, H–156, was composed of two whole counties: McIntosh and Glynn. In the first plan submitted by the State in 1991, it had attempted to incorporate the max-black plan in the successor district, H–173, in order to avoid an objection by the DOJ. Specifically, in the first plan H–173 consisted of all of McIntosh County and a portion of Glynn. Glynn was reached via a long protrusion that widened in the area of Brunswick, which is the county seat and is a center for black population. The black population percentage figures were 50.23% BTP and 45.78% BVAP.

In response to the first plan, the DOJ objected to this district demanding, in essence, the creation of a majority black district. Specifically, the DOJ wrote:

> In ... the Glynn/McIntosh/Liberty Counties area, alternatives which avoided *un-*

**75.** Senator Hooks represents S–14, which includes Americus, and he previously represented the House district in which Americus had been located.

**76.** Testimony indicated that when residents vote during an election they generally vote in county and city elections, as well as in state legislative races. Accordingly, the gratuitous and, to the voter, seemingly arbitrary splitting of counties, cities, and precincts creates confusion among voters and election officials alike.

*necessary retrogression* and which recognized minority voting potential by *drawing additional viable black majority districts* were rejected in what appears to be an effort to accommodate incumbent legislators at the expense of black voters.

*Johnson III*, Pl.Exh. 139, at 3 (emphasis added). It is unclear why the DOJ would contend that this first plan for H–173 constituted an "unnecessary retrogression," because even at the district-by-district level, there appears to have been no retrogression at all. The predecessor district in the 1982 plan, H–156, had lower black population figures: 27.64% BTP and 24.54% BVAP. In cautioning the State to avoid "unnecessary retrogression," the DOJ must have meant that it would be retrogressive for the State not to create a majority black district even though none had existed there before. If that is what the DOJ meant, its use of the term "retrogression" is at war with common sense and is inconsistent with the holding in *Miller v. Johnson*, ── U.S. at ──-──, 115 S.Ct. at 2491–92.

In response to the DOJ's objection, H–173 was extended further into Glynn County in order to pick out selected portions of the City of Brunswick solely to enhance black population. It is this second extension that created the large toe of the boot. In addition, the district was extended north from McIntosh into Liberty County, taking a third of that county. With this latest configuration, Liberty, which had only been split into three districts in the first plan,[77] was now part of four districts. This second plan boosted the black population percentage figures for H–173 to 60.58% BTP and 57.29% BVAP. The DOJ was satisfied with that.

This Court heard testimony from two witnesses who live in this area. Ms. Mattie Hicks, a retired teacher and active member of the community in Liberty County, testified that she was involved in the drawing of the proposed H–173 that was sent for inclusion in the max-black plan. Ms. Hicks testified, however, that she did not know where the "big toe" on the Glynn County boot came from because it had not been in the original plan.[78]

Mr. Leonard Dawson, a resident of Brunswick, Georgia, testified that he had also assisted in developing the plan that was submitted for use in the max-black plan. Mr. Dawson testified that communities of interest exist in these areas because these counties are served by the same organizations, such as the Coastal Georgia Community Action Authority.[79] On cross examination, however, Mr. Dawson indicated that he was aware that the purpose of the max-black plan was to obtain majority black districts. Mr. Dawson admitted that in drawing the district, he had access to maps indicating the racial composition of the area. Finally, Mr. Dawson conceded that he could not identify any purpose for the drawing of the Glynn County portion of H–173 other than to increase the black population of the district. Accordingly, as with other districts, this Court concludes that the asserted communities of interest are a *post hoc* rationalization for the drawing of a plan based solely on racial considerations.

Plaintiffs have established that race was the predominant, overriding factor explaining the creation of H–173. The direct testimony of witnesses involved in the creation of this district indicates that race was virtually the only factor considered in drawing its lines and that racial considerations subordinated race-neutral traditional districting principles.

ix) *House Districts 178 and 179*

In the 1992 plan, H–178 and H–179 are located in southwest Georgia on the Florida

---

77. Because its population of 52,745 substantially exceeded the 35,990 people needed for a House district, Liberty was too big for one House district. Its population was sufficient to fill approximately one and one-half House districts.

78. Ms. Hicks also testified about the purported existence of communities of interest in this dis-

trict. *See* the general discussion, *supra* at pp. 1545–1546, concerning the *post hoc* articulation of communities of interest.

79. Mr. Dawson is the Executive Director of the Coastal Georgia Community Action Authority.

border. H–178 is composed of parts of Thomas, Brooks, and Lowndes Counties. H–179, commonly referred to as the "wave district," is composed of parts of Decatur, Grady, and Thomas Counties.

From the outset, in order to comply with the max-black goal of creating a black district here, State officials configured H–178 with the objective of creating a new majority black district. The current core of this district is rural Brooks County. In 1982, the predecessor district, H–147, included two whole counties, Brooks and Echols, and a portion of Lowndes County; [80] this predecessor district's black population was approximately 28% BTP. Initially, State officials had not looked to Brooks County, but instead had tried to find enough blacks in the Valdosta part of Lowndes County to create a majority black district in this area. Because of the constraints of the one-person one-vote requirement, however, they could never get higher than a 42% black district. Accordingly, they switched directions and, seeing a heavily black population in Brooks County, redrew the lines to bring in that part of Brooks. This initial plan for H–178 consisted of a narrow land bridge to bring into the district the black populations of Valdosta and parts of Brooks County, which had not been split between districts in the 1982 plan. The extension into Valdosta looks somewhat like an angel blowing a trumpet and was configured solely to pick up black population in Valdosta.

In its first plan, the State was able to achieve a black majority in H–178 of 61.32% BTP and 56.03% BVAP. The DOJ objected, however, expressing its desire that the black population percentages be increased.[81] Representative Hanner testified that he under-

stood the DOJ's objection to mean that the State needed to put the entire max-black plan into effect in that area. In her testimony, Ms. Meggers concurred in that assessment, noting that in response to the DOJ's objection to H–178, the max-black plan was implemented in this area. The State complied with the DOJ's demand and redrew the district to increase the number of blacks to 63.10% BTP and 58.01% BVAP in the final plan.

As to adjacent H–179, the "wave district," there is no evidence or argument that this district was created for any reason other than to form a majority black district. The "troughs" of the wave cut out white population and the "crests" of the wave capture black population. Ms. Meggers testified that H–179 from its inception reflected the max-black plan, she felt it was an unreasonable configuration, and she had drawn it that way only to create a majority black district. Representative Hanner testified that he had always thought H–179 to be unreasonable and to violate traditional redistricting principles, but the peculiar configuration was the only way to obtain a majority black district.

For all the above reasons, this Court concludes that race subordinated all traditional districting principles in configuring H–178 and H–179. The evidence indicates that the districts tracked the racial population lines, splitting the pertinent counties into pieces, in order to maximize black voter strength for the sole purpose of creating two majority black districts in this area. Additionally, the lines of H–179 substantially track those of the southern part of S–11, a district that was conceded by Intervenors to be unconstitutional.

### 3. *Strict Scrutiny Analysis*

Once a plaintiff shows that race was the predominant motivating factor in draw-

---

**80.** A small part of Valdosta was included in H–147, in the 1982 plan, presumably for population purposes. The extension into Lowndes County in H–147 was a natural extension into the county, picking up the entire area of Lowndes bordering Brooks County on the latter's east border.

**81.** The DOJ mentioned H–178 in its first objection letter. That letter informed the State of Georgia that:

> In House District 178 ..., the proposed House plan appears to manipulate the configurations to limit the racial percentages and to protect the incumbents in these areas. Furthermore, alternative plans were available that provide for effective black majority districts and the state again fails to provide a nondiscriminatory reason for rejection of such alternatives.
>
> *Johnson III*, Pl.Exh. 139, at 3.

ing a district, the court must examine whether the districting legislation is narrowly tailored to achieve a compelling state interest. *Miller v. Johnson,* —— U.S. at ——, 115 S.Ct. at 2490.

As stated above, the State Defendants have conceded that the General Assembly had no interest in drawing the challenged districts other than to satisfy the racially motivated demands of the DOJ. Indeed, the State has conceded that the challenged parts of the 1992 plan are unconstitutional for this reason. *Johnson III,* Pl. First Amendment to Motion for Preliminary Injunction, at 1. However, the DOJ maintains, as it did in *Johnson I,* that the State's compliance with the requirements of section 5 of the Voting Rights Act, as articulated in the DOJ objection letters, is a compelling state interest. The Supreme Court held that whether or not compliance with the Voting Rights Act, standing alone, provides a compelling state interest, compliance with the preclearance mandates in the DOJ objection letters of *Johnson I* did not provide a compelling state interest because those race-based mandates were "not reasonably necessary under a constitutional reading and application of [the Voting Rights Act]." *Miller v. Johnson,* —— U.S. at ——, 115 S.Ct. at 2491.

The same DOJ black maximization policy that resulted in *Johnson I* and *Miller v. Johnson* has led to this case. Just as that black maximization policy motivated the DOJ's serial objections to Georgia's congressional redistricting plan, it also motivated the DOJ's serial objections to Georgia's state legislative redistricting plan. As the Supreme Court noted in *Miller v. Johnson,* the DOJ's black maximization policy has no place in the review of a plan for section 5 preclearance. The proper limits of a section 5 review are made explicit in *Miller v. Johnson:*

"[T]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." The Justice Department's maximization policy seems quite far removed from this purpose.

—— U.S. at ——, 115 S.Ct. at 2493 (quoting *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976)) (citation omitted). The *Beer* Court explained that if a plan is "ameliorative," that is, it increases the number of majority black districts, it "cannot violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." 425 U.S. at 141, 96 S.Ct. at 1363.

In letters to the DOJ concerning the first and second submissions of 1991–92, the State explained that it did not track the max-black plan precisely because it also wanted to adhere to other districting principles. *Johnson III,* Pl.Exh. 137, 140–41. Nevertheless, the first and second versions of the plans submitted by the State increased the number of majority black districts overall and also increased the black population percentage figures within some of the districts over the 1982 plan, as updated with 1990 census data. *See Johnson III,* Pl.Exh. 150, 170.

As the *Miller v. Johnson* Court found with regard to Georgia's congressional plan, the evidence "does not support an inference that the plan 'so discriminates on the basis of race or color as to violate the Constitution,' and thus cannot provide any basis under § 5 for the Justice Department's objection." —— U.S. at ——, 115 S.Ct. at 2492 (quoting *Beer v. United States,* 425 U.S. at 141, 96 S.Ct. at 1363) (citation omitted). In short, the DOJ improperly used section 5 preclearance as a tool to maximize majority black districts instead of as a safeguard against retrogression. Because the DOJ based its objection letters on this faulty reading of section 5 of the Voting Rights Act, the State's compliance with the mandates of the DOJ cannot be construed as a compelling state interest. *Id.* at ——, 115 S.Ct. at 2490. That is exactly what *Miller v. Johnson* held.

The State of Georgia has never argued that it drafted the House and Senate plans as it did to comply with section 2 of the Voting Rights Act. At least at this stage of the

proceedings, there is no persuasive evidence that the racial gerrymandering that occurred was necessary to comply with section 2. Accordingly, compliance with that provision of the Voting Rights Act cannot be a compelling state interest in this case either.

In addition to the absence of a compelling state interest for the racial gerrymandering, Plaintiffs argue the 1992 plan is obviously not narrowly tailored. As evidence on this point, Plaintiffs put forth the 1995 plan, which "reflect[s] the state sovereign's assessment of how its traditional districting principles interface with the Voting Rights Act." *Johnson III*, Pl.Br. on Remedy and Narrow Tailoring, at 4. The 1995 plan increases the number of districts having a majority BVAP from the 1982 plan, as supplemented by the 1990 census, in both the House and Senate.[82] However, in view of Intervenors' failure to establish a compelling state interest to justify the racial gerrymandering that we have found, we need not address the narrow tailoring requirement.

Because the State's only interest in drawing sixteen of the districts in the 1992 plan was to comply with the racially motivated mandates of the DOJ, not to further a compelling interest, those parts of the plan cannot survive strict scrutiny. Plaintiffs have demonstrated a likelihood of success on the merits.

### B. *The Other Preliminary Injunction Criteria*

Having found that Plaintiffs have shown a substantial likelihood of success on the merits of their claim that parts of the 1992 plan violate the Equal Protection Clause, we turn now to the other preliminary injunction criteria. The second criterion is whether there is a substantial threat of irreparable harm to Plaintiffs if the injunction is not issued. We find irreparable harm in its purest sense will be occasioned by denying this preliminary injunction and by permitting use of a plan violating Plaintiffs' equal protection rights. Plaintiffs, indeed all citizens of Georgia, should not be denied their right to a constitutional districting plan. Further, the DOJ concedes that irreparable harm will result if the claimed constitutional violations are proven. *Johnson III*, U.S. Br. in Opposition to Pl. Motion for Preliminary Injunction, at 37.

The third criterion, a balance of harm between the parties, tips decidedly in Plaintiffs' favor. The State of Georgia, the original defendant, welcomes the injunctive relief. In view of the profound nature of harm to Plaintiffs that would result if the injunction was not issued, the DOJ and the Abrams Intervenors can hardly articulate a more compelling or overwhelming injury. No department of the government or citizen has a legitimate interest in continuing in effect a violation of another citizen's constitutional rights. Thus, the harm Plaintiffs would suffer if we permitted the continued constitutional violation clearly outweighs any harm the injunction may cause other parties.

The fourth criterion is whether granting the injunction would disserve the public interest. The public has a strong interest in having elections conducted according to constitutionally drawn districts, instead of pursuant to racially gerrymandered lines that violate the constitutional rights of all citizens

**82.** The following charts compare, plan by plan, the number of districts in which there is a majority BTP and majority BVAP:

SENATE PLANS

| | BTP | BVAP |
|---|---|---|
| 1982 plan (no BVAP available) | 9 | — |
| 1982 plan, as supplemented by the 1990 census | 11 | 9 |
| 1992 plan | 13 | 13 |
| 1995 plan | 11 | 11 |

HOUSE PLANS

| | BTP | BVAP |
|---|---|---|
| 1982 plan (no BVAP available) | 31 | — |
| 1982 plan, as supplemented by the 1990 census | 32 | 30 |
| 1992 plan | 42 | 40 |
| 1995 plan | 37 | 33 |

Source: *Johnson III*, Pl.Exh. 123, 124, 129, 130, 149.

within those districts. *See Miller v. Johnson,* —— U.S. at —— ── ——, ——, 115 S.Ct. at 2486–87, 2494. In short, the public interest will be served by granting injunctive relief.

Considering the four factors relevant to the grant of a preliminary injunction, this case is not even a close one. Preliminary injunctive relief is not only appropriate, but also necessary in order to provide an interim remedy for a serious constitutional violation affecting the electoral process in the State of Georgia. It is for these reasons that we have entered our April 30, 1996, preliminary injunction order, which granted the interim remedy discussed below.

## V. THE INTERIM REMEDY

We now turn to a discussion of the interim remedy plan for the Georgia General Assembly's House and Senate districts. As we have explained, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their constitutional claim insofar as three of the 1992 Senate districts and thirteen of the 1992 House districts are concerned. Those three Senate districts are: S–10, S–11, and S–55. Those thirteen House districts are: H–111, H–120, H–121, H–131, H–133, H–136, H–140, H–141, H–158, H–159, H–173, H–178, and H–179.

Of those thirteen "unconstitutional"[83] 1992 House districts, all of the parties agree that the 1995 House plan can and should be used as an interim remedy for eight of them: H–111, H–121, H–131, H–133, H–136, H–140, H–141, and H–173. Likewise, of the three unconstitutional 1992 Senate districts, all of the parties agree that the 1995 Senate plan can and should be used as an interim remedy for one district, S–11. Having considered the 1995 plan's configurations of those districts in light of the remedial principles we will discuss hereafter, we concurred in the agreement of the parties and decided to use the 1995 plan for those eight House districts and one Senate district.

That left the parties in disagreement about the interim remedy for five of the unconstitutional House districts and two of the unconstitutional Senate districts: H–120, H–158, H–159, H–178, H–179, S–10, and S–55. We will discuss the remedial issues involving those seven districts and our disposition of them in a moment.

Before doing that, we also note that all of the parties agreed, and we concurred, that the 1995 plan should also be used as an interim remedy for all of the remaining House and Senate districts, other than the two unconstitutional Senate districts (S–10 and S–55) and five unconstitutional House districts (H–120, H–158, H–159, H–178 and H–179) we have previously mentioned, with but one category of exceptions. The only exceptions are S–12, H–149, and H–151. Those three districts are still in controversy even though we have not concluded that Plaintiffs have shown a substantial likelihood of success on the merits of their constitutional claim against the 1992 plan for those districts. The three districts are still in controversy insofar as the interim remedy is concerned because the DOJ lodged section 5 objections to the 1995 plan for S–12, H–149, and H–151, and the DOJ still objects to use of the 1995 plan for those districts. Our interim remedy plan resolves the DOJ's objections to those three districts.

To summarize our task, it came down to providing an interim remedy for a total of three of the fifty-six Senate districts and a total of seven of the 180 House districts. We will begin with a brief discussion of the principles applicable to a court-ordered redistricting remedy. Next, we will discuss application of those principles to the two unconstitutional Senate and five unconstitutional House districts to arrive at an interim remedial plan for them. Then, we will do the same for the one Senate and two House districts for which Plaintiffs have not shown a substantial likelihood of success on their constitutional claim involving the 1992 plan but for which there is a DOJ objection to use of the 1995 plan.

---

83. *See supra* note 33.

1562

## A. The Principles Applicable to Redistricting Remedies

We begin our discussion of the principles applicable to redistricting remedies with the recognition that we are putting into place an interim remedy, not a permanent one. Our remedial redistricting plan will serve for one and only one election: the upcoming 1996 election. Both the House and the Senate interim remedy plans expire by the terms of our Order after the 1996 election has been conducted, and they will not be used for any other election, unless and until some part of those plans is adopted as part of a permanent injunctive remedy in some future order after a full-blown trial on the merits has been conducted.

The interim nature of the remedial plan that we put into place has a number of important consequences, not the least of which is that the plan cannot be used as a benchmark against which to measure any future plan for nonretrogression. *See White v. City of Belzoni, Miss.,* 854 F.2d 75 (5th Cir.1988). It is good that that is so, given the time constraints under which we have labored.

■ The principles applicable to court-ordered redistricting, which we have applied to the extent that we have been able to do so in view of the exigencies of time, are several. The paramount principle is that we must act to correct the constitutional violations that we have preliminarily found. As the Supreme Court put it in *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964), "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." This case is not one of those unusual cases in which we would be justified in standing by and allowing constitutional violations to go unremedied.

■ The second principle applicable to court-ordered redistricting plans is that

they adhere to the Equal Protection Clause's requirement, announced in *Reynolds v. Sims,* of one-person one-vote. *E.g., Chapman v. Meier,* 420 U.S. 1, 22–27, 95 S.Ct. 751, 763–67, 42 L.Ed.2d 766 (1975) (applying *Reynolds* in the context of a court-ordered legislative redistricting plan). Third, court-ordered redistricting plans should not violate the Voting Rights Act, either section 2 or section 5. *See McDaniel v. Sanchez,* 452 U.S. 130, 148, 101 S.Ct. 2224, 2235, 68 L.Ed.2d 724 (1981) (noting legislative intent that the statutory protections of the Voting Rights Act "are to be available even when the redistricting plan is ordered by a federal court to remedy a constitutional violation"); *see also Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977). Finally, a court must adhere to the legislative judgments reflected in an existing redistricting plan to the extent that that plan does not violate the Constitution or federal law. *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518.

## B. The Seven Unconstitutional Districts for Which There is No Agreed Remedy

■ For the reasons that follow, we concluded that the 1995 plan's district configurations should be used as the interim remedy for the two unconstitutional Senate and five unconstitutional House districts for which the parties did not agree upon a remedy. Intervenors have not contended that the 1995 plan is unconstitutional; obviously, the State has not done so. Plaintiffs have expressed concerns that some of the 1995 plan districts bear the vestiges of the prior unconstitutional 1992 plan, and Plaintiffs have proffered a remedial plan that they contend carries no such vestiges. Nevertheless, Plaintiffs did not present evidence at the preliminary injunction hearing that any part of the 1995 plan is unconstitutional. Moreover, notwithstanding their concerns about the use of the 1995 plan in its entirety as a permanent remedy, Plaintiffs do not object to use of the 1995 plan as an interim remedy.

As is true of many of the districts in the 1995 plan, these seven districts were drawn for the purpose of remedying the constitutional defects in the corresponding districts of the 1992 plan. The 1995 plan appears to go a long way towards remedying many of the challenged defects of the 1992 plan. Accordingly, adoption of the 1995 plan as an interim remedy for these seven districts serves the paramount purpose of remedying the constitutional defects in the 1992 plan, at least those constitutional defects that are most apparent at this stage of the proceeding.

As for the second redistricting principle, no one has suggested that the 1995 plan violates the one-person one-vote principle of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362. The 1995 plan's maximum deviation among the House districts is 10.02% and among the Senate districts is 9.94%. We deem those numbers to be within the permissible range for legislatively enacted redistricting plans, especially in the absence of any suggestion from the parties to the contrary. *See Connor*, 431 U.S. at 418, 97 S.Ct. at 1835 (noting that legislatively enacted plans with deviations of under ten percent are "considered to be of prima facie constitutional validity"); *see also Gaffney v. Cummings*, 412 U.S. 735, 737, 93 S.Ct. 2321, 2323, 37 L.Ed.2d 298 (1973) (7.83% deviation); *White v. Regester*, 412 U.S. 755, 761, 93 S.Ct. 2332, 2337, 37 L.Ed.2d 314 (1973) (9.9% deviation). It does not violate the one-person one-vote principle for us to use in an interim remedy plan districts from a legislatively enacted plan that does not itself violate that principle.[84]

The third principle or set of principles applicable to redistricting, including court-ordered redistricting, are those contained in the Voting Rights Act, 42 U.S.C. § 1973 *et seq*. Two sections of that legislation operate as a constraint on redistricting plans. Section 5 contains the preclearance requirement, which prohibits any legislatively enacted redistricting plan from going into effect in a covered jurisdiction unless and until the plan is precleared through the DOJ or in a declaratory judgment action filed in the United States District Court for the District of Columbia. 42 U.S.C. § 1973c. In the related Northern District section 5 case of *United States v. Georgia*, No. 1:96–CV–700–JEC, 1996 WL 453543 (N.D.Ga. Apr. 9, 1996), we enjoined the State of Georgia from conducting elections pursuant to its 1995 plan because the plan had not been precleared. However, anticipating the possibility that part or all of the 1995 plan might be considered as an interim remedy in the present lawsuit, we expressly reserved in our Order in that case the question of whether the 1995 plan could be used as an interim remedy in the present case.

We know from *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), that although section 5 preclearance is not applicable to a court's own remedial plan, a court cannot adopt as its plan for a covered jurisdiction a legislatively enacted plan that has not been precleared. Applying *McDaniel* to the present circumstances, the DOJ argues that this Court cannot use as part of our remedial plan in this case those parts of the General Assembly's 1995 plan to which the DOJ has objected, unless and until we resolve those objections. That position seems to be a fair application of *McDaniel*, but the question becomes how do we resolve those DOJ objections.

We have little guidance in the case law about how to resolve DOJ objections to an existing unprecleared plan that is being con-

84. We realize that absent "persuasive justification," a court-ordered reapportionment plan to remedy a violation of the one-person one-vote principle must ordinarily achieve the goal of population equality with little more than *de minimis* deviation. *Connor v. Finch*, 431 U.S. at 414, 97 S.Ct. at 1833. However, our plan is not one drawn to remedy a one-person one-vote violation, and our "persuasive justification" is that we are constrained by the holding in *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, to use so much of the State legislative plan as is not violative of the Constitution or federal statutes. Complying with the *Upham* rule requires that we accept and work within the range of deviations from ideal population that are contained in the State plan from which we borrow district configurations.

sidered as a remedy for a constitutional violation. On the one hand, we cannot substitute ourselves in the preclearance process for the United States District Court for the District of Columbia, which is the exclusive venue for judicial preclearance proceedings. *E.g., United States v. Board of Sup'rs of Warren County*, 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977) (per curiam); *see also McDaniel*, 452 U.S. at 149, 101 S.Ct. at 2236. On the other hand, the Supreme Court's decision in *Miller v. Johnson* makes it clear that a court faced with a constitutional challenge to a redistricting plan, such as the 1992 plan which Plaintiffs challenge in the present case, cannot defer to the DOJ's interpretation and application of the Voting Rights Act. —— U.S. at —— - ——, 115 S.Ct. at 2491–92.

In the unusual circumstances of this case, we deem it sufficient for present purposes that all of the DOJ objections to these seven districts in the 1995 plan were premised on the constitutionality of the corresponding districts in the 1992 plan, which the DOJ used as a benchmark. We follow the Supreme Court's teaching in *Miller v. Johnson* that it is our responsibility to determine the constitutional questions in the present lawsuit, and we have done so. We have determined, at least for preliminary injunctive purposes, that each of these two Senate and five House districts were unconstitutionally drawn in the 1992 House and Senate plans. It follows that the DOJ's objections to each of the seven districts as drawn in the 1995 plan was based upon an unconstitutional premise or benchmark. If the DOJ had had the benefit of our present decision at the time it issued its objection letters, we assume that it would not have objected to these seven districts. That resolves the DOJ objections to the 1995 plan insofar as these seven districts are concerned.[85]

The second constraint that the Voting Rights Act places upon redistricting plans is section 2, which provides protection against the dilution of minority voting strength where,

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by [the Voting Rights Act] in that its members of the electorate have less opportunity than other members to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973. The Supreme Court in *Statewide Reapportionment Advisory Committee v. Theodore*, 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993), vacated the judgment of the three-judge court in *Burton v. Sheheen*, 793 F.Supp. 1329 (D.S.C.1992), "for further consideration in light of the position presented by the Solicitor General in his brief for the United States filed May 7, 1993." The Abrams Intervenors have supplied us with a copy of the Solicitor General's brief in the *Theodore* case, and it reveals that the position of the Solicitor General was that the case should be remanded to the three-judge district court for more thorough consideration of the requirements of section 2 as applied to the court-ordered redistricting plans in that case. Because the Supreme Court incorporated the position of the Solicitor General's brief, at least to some extent, in its order in *Theodore*, we have examined that brief for guidance concerning the implications for the present case of the remand decision in *Theodore*.

There are major differences between *Theodore* and the circumstances of the present case. To begin with, the existing plan in that case was challenged not only on constitutional (one-person one-vote) grounds, but also on grounds that the plan violated section 2 of the Voting Rights Act. The Solicitor General argued that, "the court's primary task was

---

**85.** The DOJ also argues that in addition to not violating the preclearance requirement, court-ordered remedy plans must also comply with the nonretrogression principle of section 5. That is a matter that is best discussed in terms of the remedial plan as a whole. *See infra* p. 1567.

to fashion a remedy that would not itself violate the legal standards that the plaintiffs had sued to enforce." Brief of the United States as Amicus Curiae at 10, *Theodore*, 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993).

Second, the district court in *Theodore* conducted a three-week trial which focused on the parties' various redistricting proposals, and it heard "considerable evidence relevant to the question of whether the particular proposed plans or districts complied with the mandates of Section 2." *Id.* at 3. That evidence included expert testimony on the extent of racially polarized voting in South Carolina, as well as other evidence relating to the *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), factors. Moreover, the parties in *Theodore* stipulated that there was evidence of racially polarized voting in the state. *Id.* at 4. By contrast, the evidentiary hearing conducted in this case lasted a total of four days, half on the liability issues and half on the remedy issues. There was scant evidence on section 2 issues, and certainly not enough evidence for this Court to conclude that any districts in the 1995 plan violate section 2.

The third and most important distinction between this case and *Theodore* is that the order imposed in that case was not truly an interim order. Although the district court had described its plan as an interim remedy, as the Solicitor General pointed out, the court had nonetheless directed that its plan was to be used not only for the upcoming 1992 elections but also for all subsequent elections, until the state enacted a plan that was precleared under section 5 of the Voting Rights Act. That meant that the court's plan could be in effect for as long as a decade. Brief of the United States as Amicus Curiae at 4, 11, 18, *Theodore*, 508 U.S. 968, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993). The permanent nature of the district court's "interim" remedy in the *Theodore* case was a critical factor. The court had said that it did not have time to conduct the "strenuous" inquiry required for resolving a full section 2 challenge to the proposed plan before the 1992

elections, but as the Solicitor General pointed out, the imminence of the 1992 election was relevant only insofar as those particular elections were concerned. *Id.* at 5, 11.

Noting that a court "has reasonable latitude in devising an interim remedy when it is confronted with tight time constraints," *id.* at 11, the Solicitor General explained:

> Given the time constraints that the court faced at the time, we do not question its decision to impose its plans in the current form for purposes of the 1992 election. But because the court's "interim" plans may as a practical matter remain in place for the next decade, we think that the court was required to afford all the parties the opportunity to present specific Section 2 objections before imposing those plans for use in future elections. The court should have received and reviewed evidence concerning each challenged district, considered that evidence in light of all of the relevant factors enumerated in *Gingles*, and included in its opinion specific, reviewable findings of fact and conclusions of law with respect to each such district's compliance with federal law.

*Id.* at 18. Unlike the plan in *Theodore*, the plan we have put into effect is an interim remedy in reality as well as in name; the plan will not remain in effect beyond the 1996 elections. A permanent plan that will apply in any future elections will be put into effect only after a full trial at which any and all relevant evidence the parties wish to present concerning section 2 issues is presented, and after those issues have been adequately considered and decided.

Adequate consideration requires adequate time, and that is one luxury that this Court has not had in framing our interim remedy. We have considered all the evidence that the parties presented, but we recognize that the tight time schedule probably prevented the parties from presenting as much evidence as they would have liked. Moreover, those same time constraints prevented this Court from exploring all of the matters we would have liked to explore, both in regard to the

constitutionality of the 1992 plan and in regard to the remedy. All of the remedy issues, including those involving section 2, are matters which we can and will give more consideration before reaching any decision concerning permanent injunctive relief.

The final redistricting principle we must apply is the *Upham* requirement that we not disturb any more of a State's plan than is necessary to remedy federal law problems. Our use of the General Assembly's 1995 plan as a remedial remedy for these seven districts easily meets that requirement.

## C. *The Three Districts for Which the 1992 Plan Has Not Been Found Unconstitutional and for Which There is a DOJ Objection to the 1995 Plan*

As we discussed earlier, there are three districts to which the DOJ objected to the use of the 1995 plan, and for which we did not find that Plaintiffs had shown a substantial likelihood of prevailing on the merits of their constitutional claim against the 1992 plan. Those districts are S–12, H–149, and H–151.[86] As to all three of those districts, we decided to adopt the interim remedy that the DOJ has advanced.

The DOJ contends that we should draw S–12 as it is drawn in the 1992 Senate plan with but one relatively small modification that is necessary to fit the 1992 plan's S–12 into the surrounding districts of the 1995 plan. That one modification involves Baker County, part of which is in S–11 in the 1992 plan. By including all of Baker County in S–12 in our remedial plan, we could fit the 1992 plan's S–12 into the 1995 plan. We have done so.

This interim remedy for S–12 meets all of the applicable redistricting principles. At least at this stage, we have found no constitu-

tional defect with the 1992 plan for S–12, so there is none to cure. The relatively minor modification to the way S–12 is drawn in the 1995 plan raises no constitutional issues itself, which is to say that what we have done does not significantly alter the constitutional issue involving S–12.

As for the *Reynolds* one-person one-vote requirement, the interim remedy for S–12 actually reduces that district's deviation from the ideal population. There are no section 5 objection problems with this remedy, because the DOJ has endorsed it. Any section 2 problems with it are not apparent. Finally, the slight modification to S–12 as it was drawn in the 1995 plan does not violate the *Upham* minimum intrusion principle, because the modification made is the minimum necessary to resolve the section 5 objection.

We turn now to the interim remedy for H–149 and H–151, which are adjacent districts in Chatham County. We agree with the DOJ that the proper course at this stage is to lift the 1992 House plan for Chatham County in its entirety and drop it into the 1995 House plan. That remedy is possible because in both plans Chatham County consists of five House districts, all of which are wholly contained within the county boundaries.

Adoption of this interim remedy for H–149 and H–151 does not fail to cure a constitutional defect that we have found in the 1992 plan, because we have not yet found one insofar as these two districts are concerned. The *Reynolds* principle is not violated, because using the 1992 plan for the Chatham County district does not increase the overall population deviation figures of the 1995 plan. The DOJ's objection to this part of the 1995 plan is resolved, so there is no section 5 problem. Nor is any section 2 problem apparent at this stage. Finally, this interim

---

**86.** To give guidance to the parties in their efforts to prepare for the remedy stage of the proceedings, after two days of hearing, we announced the list of districts on which we found Plaintiffs to have shown a likelihood of prevailing and on which preliminary injunctive relief appeared appropriate. In so doing, we applied strictly the standards for granting a preliminary injunction. Although further argument and evidence present-

ed by Plaintiffs after this announcement called into serious question the constitutionality of these three districts, as well, the Court concluded that it would not be fair to Intervenors to reopen our ruling on those districts, because they had prepared their remedy case with the understanding that these districts were no longer at issue insofar as the preliminary injunction proceeding was concerned.

remedy does not violate the *Upham* rule, because it is the least disruptive way to resolve the DOJ's objections to H–149 and H–151.

### D. *The Nonretrogression Principle*

The DOJ contends that any court-ordered remedial plan must comply with the nonretrogression principle of section 5, if possible. We agree. *See McDaniel v. Sanchez*, 452 U.S. 130, 148, 101 S.Ct. 2224, 2235; *see also Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518; *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828. The House and Senate plans we have ordered as an interim remedy do not violate the nonretrogression principle of section 5.

We reject any notion that the 1992 plan is the appropriate benchmark for measuring retrogression. That plan is unconstitutional in substantial part precisely because it includes racially gerrymandered districts that artificially and unconstitutionally increase the number of majority black districts. To use an unconstitutional plan as a benchmark would perpetuate the constitutional violation. The proper benchmark, in our view, is the 1982 plan, which is the last legislative plan in effect before the unconstitutional 1992 plan was enacted. *See Johnson II*, 922 F.Supp. at 1569 n. 20 (S.D.Ga.1995). To have a more accurate and current picture though, it is appropriate to bring the 1982 plan up to date with the 1990 census figures.

Updating the 1982 Senate plan with the 1990 census population figures shows that had that plan been left in effect, there would have been nine BVAP majority districts. The interim remedy plan we have ordered for the Senate contains eleven BVAP majority districts. As the Supreme Court said about other redistricting plans in *Miller v. Johnson*, "[t]hese plans were 'ameliorative' and could not have violated § 5's non-retro-

gression principle." —— U.S. at ——, 115 S.Ct. at 2492.

As for the House, updating the 1982 House plan with the 1990 census population figures shows that had that plan remained in effect, there would have been thirty BVAP majority districts. The interim remedy plan we have ordered for the House contains thirty-four BVAP majority districts. That, too, is an ameliorative change that cannot and does not violate the nonretrogression principle of section 5.[87]

## VI. CONCLUSION

For the reasons stated, Plaintiffs have shown a substantial likelihood of prevailing on the merits of their Equal Protection Clause claim insofar as three of the 1992 plan's Senate districts and thirteen of its House districts are concerned. They are entitled to interim relief, and the remedial plan put into place in our April 30, 1996, Order is a proper interim relief plan.

---

87. The DOJ has argued that we should apply a "layered approach" that employs not only a statewide benchmark but also locality or regional benchmarks. At this stage, we are unconvinced that we are required to employ such an ap-proach, and the DOJ has not offered an evidentiary analysis suggesting that such an approach would yield a different result. In view of the time constraints we face, we decline to undertake such an analysis ourselves.